**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civ. Action No. <u>1:26-cv-3427</u>

BOARD OF EDUCATION OF JEFFERSON
COUNTY SCHOOL DISTRICT RE-1,

      Plaintiff,

v.

LINDA McMAHON, in her official capacity
as Secretary of Education of the United States, and
UNITED STATES DEPARTMENT OF EDUCATION,

      Defendants.

---

## <u>COMPLAINT</u>

---

Jeffco's mission is to "provide a world-class education that prepares all Jeffco students for bright and successful futures as local and global citizens." To do that for all its 75,000 students, Jeffco relies on more than $50 million dollars each year from the federal government. But recently, the United States Department of Education (the "Administration") threatened to withhold that money based on nothing more than Jeffco's commitment to follow state law and a gross mischaracterization of how Jeffco operates. Jeffco has worked with the Administration to answer its questions, discuss potential solutions, and explain Jeffco's operations. But the Administration has not followed its own policies, ignored the information Jeffco has provided, and taken concrete steps to threaten Jeffco's federal funding.

Jeffco, seeking to protect its federal funds while following Colorado law, brings this Complaint to ensure the Administration follows the law and the Constitution. The Administration has placed Jeffco in an untenable and precarious position—either violate Colorado law by submitting to the Administration's threats or risk imminent federal enforcement action that would harm all Jeffco students. The Administration's actions are arbitrary and capricious, fail to comply with well-established rules that govern agency rulemaking, and violate the United States Constitution. Jeffco comes to this Court seeking relief from these unlawful actions under the Administrative Procedure Act, 5 U.S.C. §§ 701–06 (the "APA") and the Declaratory Judgment Act, 28 U.S.C. § 2201.

In support of this Complaint, Jeffco makes the following allegations:

## **INTRODUCTION**

1. The Administration's sole justification is its position that Title IX prohibits schools from following binding Colorado law and allowing transgender girls to access girls' facilities, participate on girls' sports teams, and travel with their peers—a position adopted without notice-and-comment rulemaking and directly contrary to the Department of Education's prior position. The Administration claims that Title IX *requires* schools to separate students by birth sex in facilities and athletics—but no court has so held, no properly issued regulations so require, and the Supreme Court expressly left that question open in *West Virginia v. B.P.J.*, 604 U.S. ___, No. 24-43, slip op. at 3 n.1 (June 30, 2026). And the Supreme Court there reiterated the importance of leaving this "policy debate[] … to the people, their elected representatives, and the democratic process." *Id.* at 26. This democratic process has spoken three times on this dispute, all of which prohibit the

Administration's behavior: 1) Jeffco's policy—the result of decisions by elected school board members; 2) Colorado law, which forecloses the changes the Administration threatens; and 3) federal law, including the APA, which requires specific steps that have not been taken before massive overhauls in the Administration's approach to Title IX.

2.      Jeffco's practices are mandated by the Colorado Anti-Discrimination Act ("CADA"), and Jeffco cannot comply with the Administration's demands without violating binding state law.

3.      Defendants' actions are based on the Administration's enforcement position that Title IX prohibits schools from permitting transgender girls to access girls' facilities and participate on girls' sports teams.  In its February 2025 Title IX Directive, the Administration asserted that Title IX requires schools to discriminate against transgender students but did not offer a reasoned explanation for the shift from the Department's prior position to the contrary.  The Administration simply declared that its current position is predicated on President Trump's Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*.[1]  This Executive Order was summarily issued on the first day of the current administration and conflicts with multiple decisions of federal courts that have been issued on this contentious issue in prior years.

4.      The Administration's current enforcement position is the fourth major shift in the Department of Education's interpretation of Title IX, and it was not adopted through

---

[1] Exec. Ord. 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 FED. REG. 19 (Jan. 30, 2025), https://www.govinfo.gov/content/pkg/FR-2025-01-30/pdf/2025-02090.pdf.

notice-and-comment rulemaking. There was no announcement of the change in policy, no opportunity for comment by various stakeholders, and no reasoned consideration of feedback. To the contrary, the Executive Order, the February 2025 Title IX Directive, and a series of enforcement actions pursued by the Defendants in following months were all issued and pursued unilaterally, without following the process set forth in law for implementing new rules and policies. The Administration's interpretation of Title IX conflicts with CADA, which binds Jeffco and all other school districts in the state.

5. The Administration launched an investigation of Jeffco schools based on this new interpretation. Upon receipt of notice of this investigation, Jeffco has consistently cooperated with the Administration, providing information and attempting to engage with the Administration to find a negotiated resolution that would resolve the tension between Jeffco's obligation to abide by state law and its interest in resolving the investigation. Despite those good-faith efforts at resolution, the Administration abruptly declared an "impasse" the day before its next scheduled meeting with Jeffco and then failed to attend the meeting. Instead of negotiating in good faith, as required by OCR's Case Processing Manual, the Administration informed Jeffco that if it did not capitulate to its demands, it would bring an enforcement action against Jeffco and publicly threatened that Jeffco's refusal to comply with its demands will result in "accountability and consequences."

6. Specifically, the Administration insisted that to avoid adverse federal action, Jeffco must agree to "Action Item 1" in their Proposed Resolution Agreement. Action Item 1, in turn, demands that Jeffco make a public announcement that it will do the following:

- 4 -

a) State that the words sex, female, male, women, and men, as applicable in all

District practices, policies, and procedures mean the following:

    i. "Sex" is a person's immutable biological classification as either male or female and does not include "gender identity."

    ii. "Female" is a person of the sex characterized by a reproductive system with the biological function of producing eggs (ova);

    iii. "Male" is a person of the sex characterized by a reproductive system with the biological function of producing sperm;

    iv. "Woman" is an adult human female;

    v. "Girl" is a minor human female;

    vi. "Man" is an adult human male; and

    vii. "Boy" is a minor human male;

b) Specify that transgender females may not compete in girls' athletics;

c) Specify that locker rooms, restrooms, and overnight accommodations will be strictly segregated based on sex assigned at birth and access not made available based on gender identity;

d) Specify that the above sex-based segregation will apply without regard to state law; and

e) Refrain from contracting with any third-party for educational or athletic programming if that party does not operate in accordance with the above restrictions.

7.    But this demand is irreconcilable with the requirements of CADA, which has protected transgender students since 2009.  CADA states:

It is a discriminatory practice and unlawful for a person, directly or indirectly, to refuse, withhold from, or deny to an individual or a group, because of disability, race, creed, color, sex, sexual orientation, gender identity, gender expression, marital status, national origin, or ancestry the full and equal

enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or, directly or indirectly, to publish, circulate, issue, display, post, or mail any written, electronic, or printed communication, notice, or advertisement that indicates that the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation will be refused, withheld from, or denied an individual or that an individual's patronage or presence at a place of public accommodation is unwelcome, objectionable, unacceptable, or undesirable because of disability, race, creed, color, sex, sexual orientation, gender identity, gender expression, marital status, national origin, or ancestry.

CO Rev. Stat. § 24-34-601(2)(a) (2024).

8.     The Colorado Civil Rights Commission's rules implementing CADA provide:

All covered entities shall allow individuals the use of gender-segregated facilities that are consistent with their gender identity. Gender-segregated facilities include, but are not limited to, restrooms, locker rooms, dressing rooms, and dormitories.

3 CCR 708-1, Rule 81.9(B).

9.     Defendants' actions create immediate harm to Jeffco.  Jeffco must either change its practices in a manner that would violate Colorado law or risk proceedings that jeopardize federal funding for essential programs.  Jeffco at all times strives to comply with federal and state law and ensure it creates an environment in which all students can learn and thrive.  Jeffco cares deeply for every one of its students and unequivocally supports every student's right to learn in an environment free from discrimination and harassment.  The Defendants' actions jeopardize those goals and threaten to divert critical resources away from Jeffco's educational mission.  The conflict between state law and the Administration's demands creates significant uncertainty among Jeffco students, staff, and families, and threatens Jeffco's core values.

10. Defendants' issuance of the Letter of Impending Enforcement Action, culminating a process that included a Letter of Findings, Proposed Resolution Agreement, and Letter of Impasse, constitutes final agency action subject to review under the APA, 5 U.S.C. § 706. Defendants' action cannot withstand that review because it is arbitrary, capricious, an abuse of discretion, based on an interpretation of federal law that has not undergone proper notice-and-comment procedures, and in violation of the Spending Clause and the First Amendment. Accordingly, the Court must hold unlawful and set aside Defendants' actions.

11. The Court should separately declare that Defendants' Letter of Findings, Proposed Resolution Agreement, Letter of Impasse, and Letter of Impending Enforcement Action violate the APA, the Spending Clause, and the First Amendment.

## JURISDICTION AND VENUE

12. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the APA, 5 U.S.C. §§ 701–06, the Declaratory Judgment Act, 28 U.S.C. § 2201, and Title IX.

13. Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies and officers of the United States sued in their official capacities. The Board of Education of Jefferson County School District Re-1 is a public body operating in the District of Colorado. Jefferson County Public Schools is a local government agency operating in the District of Colorado. A substantial part of the events or omissions giving rise to this Complaint occurred and continues to occur within this District.

## PARTIES

14.    Plaintiff Board of Education of Jefferson County School District Re-1 operates, maintains, and supervises the Jefferson County Public Schools.

15.    Jefferson County Public Schools is a school district within the State of Colorado.  Jefferson County Public Schools is the second-largest school district in Colorado, serving approximately 75,000 students.  Jeffco is committed to creating an educational environment in which every student can learn and thrive, free from discrimination and harassment.

16.    Defendant Department of Education is an executive department of the United States.  It is headquartered in Washington, D.C.

17.    Defendant Linda McMahon is the United States Secretary of Education and is sued solely in that capacity.  As Secretary of Education, Defendant McMahon is head of the Department of Education.

## FACTUAL ALLEGATIONS

**I.      The Department of Education's Office for Civil Rights Investigates Jeffco's Policy and Practices.**

18.    On June 2, 2025, the Office for Civil Rights of the Department of Education ("OCR") issued a press release announcing the inaugural recognition of June as "Title IX Month," during which the Department "will highlight actions taken to reverse the Biden

Administration's legacy of undermining Title IX and announce additional actions to protect women in line with the true purpose of Title IX." [2]

19.    In the same press release, OCR announced it was opening an investigation into Jeffco "for its policy that students will be 'assigned to share overnight accommodations with other students that share a student's gender identity,' thus removing the safeguard of single-sex overnight accommodations." *Id.*  The press release accused Jeffco of "allegedly mislead[ing] parents by informing them that girls and boys will be separated for overnight accommodations without divulging that its definition of 'girl' includes boys who claim a female identity." *Id.*

20.    On June 2, 2025, OCR issued Jeffco a Notice of Directed Investigation in which the Department alleged that Jeffco's Policy JB-R2 "discriminates against female students" by (1) "permitting male students to access bathrooms and locker rooms designated for use by female students," (2) "denying equal athletic benefits and opportunities to female student athletes by permitting males to participate in girls' interscholastic athletics," and (3) "forcing female students to share overnight accommodations with male students during overnight activity and athletic trips." Ex. A. The Notice requested 12 categories of information and documentation from Jeffco.

21.    On July 7, 2025, Jeffco fully responded to OCR's data request in a timely manner and provided copies of all district policies that OCR requested, an informal guidance document, and copies of rosters for Jeffco's athletic teams.  Ex. B.  In response

---

[2] *U.S. Department of Education Recognizes June as 'Title IX Month,'* U.S. DEP'T OF EDUC. (June 2, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-recognizes-june-title-ix-month.

to OCR's request for a copy of all complaints received by Jeffco regarding the policies at issue in the investigation, Jeffco responded that it had no such formal complaints but identified an ongoing lawsuit in federal district court related to the overnight accommodations policy, *Wailes v. Jefferson Cnty. Pub. Sch.*, 1:24-cv-02439 (D. Colo. 2024). *Id.* Jeffco also explained that, when developing its policies, it relied on rules and regulations from the Colorado Civil Rights Commission and was bound by Colorado state law, specifically CADA, Colo. Rev. Stat. § 24-34-301 *et seq.* *Id.*

22.     Eight months elapsed, during which OCR made no effort to follow-up with or speak to Jeffco. There was no attempt to discuss or clarify the data received with Jeffco staff, no interviews with any Jeffco staff or students, and no site visits—all of which are typical of OCR investigations. Jeffco did not receive any communication at all from OCR during the investigation.

23.     On March 13, 2026, OCR issued a Letter of Findings ("Findings") and Proposed Resolution Agreement to Jeffco. Exs. C; D.

24.     In the Findings, OCR relied on Executive Order 14168 and selected caselaw that is not binding in the Tenth Circuit to determine:

    a. "The District's policies violate Title IX because they segregate intimate facilities and assign overnight accommodations on the basis of a student's 'gender identity consistently asserted at school' . . . . [T]he District has purported to create sex-separate intimate facilities but it has abandoned the biological justification for sex separation in intimate facilities by allowing males who identify as females to use intimate facilities designated for

females.  So it discriminates based on sex by separating the sexes without a valid basis under Title IX and thus is in violation of Title IX." Ex. C at 27–28.[3]

b.  "The District's policies related to athletics violate Title IX by discriminating against female students in violation of 34 C.F.R. § 106.41(a) (and outside the exception created by 34 C.F.R. § 106.41(b)) and by denying female students the equal opportunity in athletics guaranteed by 34 C.F.R. § 106.41(c). . . .  [T]he District has abandoned the biological justification for sex separation in athletics by allowing males who identify as females to participate in girls' athletics, so the District is discriminating based on sex by separating the sexes without a valid basis under Title IX and thus is in violation of Title IX." *Id.* at 29.

25.    The Letter of Findings based its conclusion on a "finding" that Jeffco's athletic team roster data showed 61 boys competing on girls' sports teams. *Id.* at 13–14. OCR did not review the roster data with Jeffco before reaching this conclusion.  Had it done so, as Jeffco made multiple oral and written attempts to clarify after receiving the Findings, Jeffco would have advised OCR that its calculation was based on a misunderstanding of the data Jeffco provided.

26.    The Letter of Findings also based its conclusion on the unproven allegations by the plaintiffs in *Wailes v. Jefferson Cnty. Pub. Sch.*, No. 1:24-cv-02439 (D. Colo. 2024). Ex. C at 14–15.  However, that case was then (and is now) still pending, and, to date, the

---

[3] Page references are to the ECF page number.

district court has not made any factual findings regarding those allegations.  In fact, the district court dismissed the case on August 7, 2025, without determining the merits of the plaintiffs' claims.  *Wailes v. Jefferson Cnty. Pub. Sch.*, 2025 WL 2530790 (D. Colo. Aug. 7, 2025).  The dismissal order is currently on appeal, and the merits of plaintiffs' allegations have still not been considered.  *Wailes v. Jefferson Cnty. Pub. Sch.*, No. 25-1341 (10th Cir. Sept. 3, 2025).  The Findings provided no indication that OCR itself conducted an investigation into the *Wailes* plaintiffs' allegations that would support its reliance on those assertions as factual support.

27.    Additionally, the Findings relied on a partial settlement agreement in a lawsuit that Jeffco is not a party to—a case that was brought by another Colorado school district against the Colorado High School Athletic Association ("CHSAA"), the Colorado Attorney General, and the Colorado Civil Rights Division, *School District 49 v. Sullivan*, No. 25-CV-1463 (D. Colo.).  Ex. C at 31.  The Findings claimed that partial resolution of the third-party *Sullivan* case rendered Jeffco's response to the data request "inaccurate," but Jeffco was not a party to the *Sullivan* matter or its partial resolution, which was reached *five months after* Jeffco's response to OCR's data request.  *Id.*  The *Sullivan* litigation is ongoing, and a magistrate judge has recommended dismissal of the remaining claims.  Recommendation of United States Magistrate Judge, *School District 49 v. Sullivan*, No. 25-CV-1463  (D. Colo. Jan. 13, 2026), ECF 60.  At no point during its investigation of Jeffco did OCR reach out to discuss the *Sullivan* partial settlement agreement, provide a copy of the agreement, or discuss its purported impact on Jeffco.

28.    OCR attached a Proposed Resolution Agreement to the Letter of Findings and stated that "[i]f OCR determines an agreement will not be reached, the Department may begin enforcement action including referral to the U.S. Department of Justice or other means authorized by law, including the initiation of an action to suspend, terminate, or refusal to grant or continue federal financial assistance."  Exs. C at 32; D.

29.    OCR's Proposed Resolution Agreement required Jeffco to agree to take three action items:

a. Action Item 1 required Jeffco to issue a public statement that it will comply with Title IX by adopting Trump Administration-approved, reproductive-based definitions of the words "sex," "male," and "female."  The statement must specify that Jeffco agrees that Title IX compliance requires assignment of intimate facilities and overnight accommodations as well as eligibility to compete in sports to be based on birth sex and those definitions, rescinding or revising any Jeffco policies to the contrary.  Further, OCR required Jeffco to post this statement in a prominent location on its main website, each of its school websites, and on each of its websites for girls' athletics, and to notify all staff, students, and coaches of Jeffco's policy rescissions and revisions.  Ex D at 2–4.

b. Action Item 2 required Jeffco to "[r]eview all individual athletic records, titles, honors, awards or similar recognition (herein, 'Recognitions') received by male athletes competing in girl's athletics at any time up to and including the reporting date indicated below; and review all team Recognitions for

competitions in which any male athlete competed in girl's athletics."  After such review, OCR demanded that Jeffco "[r]estore to individual female athletes all individual Recognitions such female athletes earned" and send a letter to the female athlete "expressing apology on behalf of the District."  *Id.* at 4.

    c. <u>Action Item 3</u> required Jeffco to train its staff on the Revised Policies required in Action Item 1.  *Id.* at 5.

30.    On the same day, OCR issued a press release publicly announcing that it "concluded that [Jeffco] violated Title IX . . . by permitting male students to access female bathrooms, locker rooms, and overnight accommodations, and to compete in female sports."[4]  The press release highlighted OCR's erroneous factual finding, stating that "OCR received athletic rosters from Jefferson County indicating that male students may occupy up to 61 roster positions on girls' sports teams in the District" and further characterizing Jeffco's Title IX violations as "sweeping."  *Id.*  The press release also declared that "[t]he Trump Administration will not relent until female athletes' safety, opportunities, and equal protection under the law are fully restored."  *Id.*

**II.    Jeffco's Response and Good-Faith Negotiations.**

31.    On March 20, 2026, Jeffco confirmed receipt of the Findings and the Proposed Resolution Agreement, acknowledging that the Findings triggered the 90-day

---

[4] *U.S. Department of Education's Office for Civil Rights Concludes Jefferson County Public Schools in Colorado Has Violated Title IX*, U.S. DEP'T OF EDUC. (Mar. 13, 2026), https://www.ed.gov/about/news/press-release/us-department-of-educations-office-civil-rights-concludes-jefferson-county-public-schools-colorado-has-violated-title-ix.

resolution window set forth in Section 303(f) of the OCR Case Processing Manual and indicating that it would provide an initial response within 30 days.

32.   On April 12, 2026, Jeffco sent a letter to OCR requesting additional information before providing a full response to the Findings and Proposed Resolution Agreement.  Ex. E.  Specifically, Jeffco alerted OCR that its conclusion that 61 boys held positions on girls' teams was incorrect.  *Id.* at 2–3.  Later communications explained that *no* boys held competitive spots on girls' teams, but that the rosters showed some boys served in supporting roles (i.e., as trainers, mascots, and team managers) for girls' teams and vice-versa.  *Id.* Jeffco also asked OCR to produce the partial settlement agreement in *School District 49 v. Sullivan*, relied on by OCR's Findings, noting that Jeffco was not a party to the case or the partial settlement, and sought clarification as to how Jeffco could be bound by it.  *Id.* at 3.

33.   On May 8 and May 21, 2026, Jeffco met with OCR to address the significant factual errors in the Findings.  Jeffco explained its critical need for additional information to fully evaluate the Proposed Resolution Agreement.  For example, Action Item 2 requires Jeffco to review all girls' athletics recognitions throughout District history to find out if any boys were recognized, to retroactively give the award to a girl who might otherwise have received it and apologize to each such girl.  To do so, Jeffco would have to know the sex assigned at birth of every student-athlete who has ever enrolled at Jeffco *and* the sex assigned at birth of every student-athlete from any other teams who competed against Jeffco.  Meanwhile, because Colorado law permits parents to obtain amended birth certificates for their children, and amended certificates cannot "indicate …

that the gender designation or name … has been changed," C.R.S. §25-2-113.8(2)(b), (3), and (8-9), and since families may enroll their children in school with documents ranging from the family Bible to a birth certificate, it would be practically impossible for Jeffco to know with any degree of certainty what sex was assigned at birth for all of its own students—let alone that of the tens of thousands of student-athletes from other schools.  And setting aside that likely insurmountable challenge, because as Jeffco explained to OCR it was not aware of any boys competing on girls' athletic teams, there is simply no need for Action Item 2.  This is but one issue Jeffco brought to OCR's attention, and to which OCR agreed to provide follow-up information in writing.  It is because of these significant issues that the parties agreed to meet again on June 16, 2026.  Yet, despite having actual knowledge of the wrongness of its factual Findings and being confronted with the reality that multiple terms of its Proposed Resolution Agreement sought to solve nonexistent problems, OCR neither revised its Findings or the Proposed Resolution Agreement, nor recanted its public announcement of its erroneous Findings.

34.    On May 27, 2026, without having provided any of the follow-up information it had agreed to provide and despite the scheduled meeting to continue negotiations on June 16, OCR requested a quick phone call during which OCR staff newly requested that Jeffco provide a written response by June 2, 2026, indicating whether it agreed in principle to Action Item 1 of the Proposed Resolution Agreement, which required rescission or revision of Jeffco policies to comply with the new, uncodified interpretation of Title IX.

35.    On May 29, 2026, OCR emailed its request to Jeffco to agree to Action Item 1.  At no point did OCR revise its Letter of Findings or the Proposed Resolution

Agreement based on the clarifications Jeffco provided or provide the follow-up information previously promised.

36.    On June 2, 2026, Jeffco responded by letter requesting continued discussions with OCR. Ex. F. Jeffco explained that obtaining the requested follow-up information from OCR "is crucial to Jeffco's ability to meaningfully evaluate each of the three Action Items in the proposed resolution agreement." *Id.* at 2. Jeffco reiterated its prior requests for additional information on the roster miscalculation and the partial case settlement with CHSAA in *Sullivan*. *Id.* at 2–3. Further, Jeffco noted that OCR had explicitly agreed to discuss Jeffco's concerns about compliance with CADA during the scheduled June 16 meeting. *Id.* at 3.

37.    On June 3, 2026, less than 24 hours after receiving the June 2 letter, OCR issued Jeffco a Letter of Impasse informing Jeffco that enforcement proceedings would not be delayed and that it intended to issue a Letter of Impending Enforcement Action within ten days unless Jeffco executed the Resolution Agreement by June 15, 2026, one day before the parties were scheduled to meet again. Ex. G. The Letter of Impasse did not acknowledge Jeffco's continued cooperation and good-faith negotiation or the scheduled meeting. *See id.* Moreover, the Letter of Impasse came within the initial 90 days that the OCR Case Processing Manual provides for good-faith negotiations. *See id.*

38.    On the same day, OCR issued a press release announcing the issuance of the Letter of Impasse and tying it to its proclamation of June 2026 as the second annual "Title IX Month," stating: "As we continue to honor June as Title IX Month, the Trump Administration will not allow students to continue to be abused at the hands of a radical

- 17 -

ideological agenda that undermines the basic protections to which they are entitled under law." [5]

39.    On June 15, 2026, Jeffco sent a letter to OCR expressing disagreement with its finding that the parties were at an impasse, reminded OCR of its incorrect factual findings, and reiterated Jeffco's commitment to complying with state and federal law and working with OCR to resolve the matter.  Jeffco also stated that it planned to participate in the June 16 meeting.  Ex. H.  OCR did not respond to Jeffco's letter and also did not participate in the June 16 meeting.

**III.    Defendants Issue Jeffco a Letter of Impending Enforcement Action Placing Jeffco's Federal Funding at Risk.**

40.    On June 26, 2026, OCR issued Jeffco a Letter of Impending Enforcement Action, which stated:

a.  "Based on a review of publicly available information, District policy and guidance documents, and athletic program information, OCR determined that the District is not in compliance with Title IX and its implementing regulations with regard to the District's policies and practices which allow male students to access female bathrooms, locker rooms, and overnight accommodations."  Ex. I at 2.

b.  "In addition, OCR also determined that the District is not in compliance with Title IX and its implementing regulations with regard to the District's policies

---

[5] *U.S. Department of Education Issues Warning Letter to Jefferson County Public Schools in Colorado as District Refuses to Follow Title IX*, U.S. DEP'T OF EDUC. (June 3, 2026), https://www.ed.gov/about/news/press-release/us-department-of-education-issues-warning-letter-jefferson-county-public-schools-colorado-district-refuses-follow-title-ix.

and practices which deny equal athletic benefits and opportunities to female student athletes by permitting males to participate in girls' interscholastic athletics." *Id.*

c.  "In accordance with the Title IX regulatory procedures for bringing recipients into compliance, as set forth at 34 C.F.R. § 106.81 and 34 C.F.R. § 100.8, OCR provided the District with a Proposed Resolution Agreement concurrently with the Letter of Findings.  The Proposed Resolution Agreement specified the actions that the District must take to voluntarily come into compliance with Title IX and remedy the Title IX violations." *Id.*

d.  "If the District fails to enter into a resolution agreement with OCR within 10 calendar days from the date of the issuance of this letter, OCR may: (1) initiate administrative proceedings to suspend, terminate, or refuse to grant or continue and defer financial assistance from funds made available through the Department to the District; or (2) refer the case to the United States Department of Justice for judicial proceedings." *Id.* at 3.

41.  The same day, the Administration issued a press release regarding the Letter of Impending Enforcement Action.[6]  In the release, Assistant Secretary for Civil Rights Kimberly Richey stated: "Today's action makes clear that continued noncompliance [with Title IX] will be met with accountability and consequences." *Id.*  The

---

[6] *U.S. Department of Education Takes Action Against Jefferson County Public Schools for Continued Violations of Title IX*, U.S. DEP'T OF EDUC. (June 26, 2026), https://www.ed.gov/about/news/press-release/us-department-of-education-takes-action-against-jefferson-county-public-schools-continued-violations-of-title-ix.

press release also touted its recognition of June as Title IX Month to "restor[e] [Title IX's] original promise for women and girls." *Id.*

42.    On July 6, in response to the Letter of Impending Enforcement Action's invitation that the "District propose any revisions [to the Proposed Resolution Agreement] for OCR's consideration," Jeffco sent OCR a redline and a letter explaining the reasoning behind the revisions.   Ex. J at 6–9.  The redline struck all language from the Proposed Resolution Agreement in tension with Colorado state law prohibiting discrimination of students on the basis of gender identity and kept language that would reaffirm Jeffco's commitment to follow the law. *Id*.  The letter, again, reminded OCR of Jeffco's obligations under Colorado law and reiterated that OCR's Findings must be amended because they are based on the false assertion that "at least 61 female roster positions are held by students who do not identify as female." *Id.* at  3.  OCR has not responded to Jeffco's letter or redline.

## IV.    Jeffco's Policies Have Been in Place Since 2013 and Comply with State Law.

43.    Since 2009, CADA has prohibited discrimination on the basis of gender identity in places of public accommodation, including educational institutions.  CO Rev. Stat. § 24-34-601(2)(a).  In 2013, the Colorado Civil Rights Commission issued a decision holding that a school district violated CADA when it denied a transgender female access to the girls' restroom.   *See Mathis v. Fountain-Fort Carson*, CCRD Charge No. P20130034X (June 17, 2013).

44.    Jeffco has long maintained Policy AC: Nondiscrimination and Equal Opportunity ("Policy AC").  Ex. K.  In May of 2013, Jeffco adopted Policy JB: Equal

Education Opportunities ("Policy JB").  Ex. L.  In November of 2013, Jeffco added an accompanying regulation JB-R1: Equal Education Opportunities – Transgender Students, pursuant to CADA.  CO Rev. Stat. § 24-34-301 *et seq*.  The 2013 regulation has been amended and updated and is currently codified as Policy Regulation JB-R2 ("Policy JB-R2").  Ex. M.

45.    Though language and numbering have changed over the intervening years, Jeffco policies continue to provide these same protections.  Policy AC provides:

> The schools in the district are subject to laws prohibiting discrimination on the basis of disability, race, creed, color, national origin, gender, sex, sexual orientation, gender expression, gender identity, religion, veteran status, pregnancy, marital status, age, ancestry, genetic information, need for special education services, or any other applicable status protected by federal, state, or local law ("protected status").  Accordingly, no otherwise qualified student, employee, applicant for employment, or member of the public may be excluded from participation in, be denied the benefits of, or be subjected to unlawful discrimination under any district program or activity on the basis of any legally applicable protected status.

Ex. K at 2.

46.    Policy AC defines "Gender Expression" as "an individual's way of reflecting and expressing the individual's gender to the outside world, typically demonstrated through appearance, dress, and behavior."  *Id.*  Policy AC defines "Gender Identity" as "an individual's innate sense of the individual's own gender, which may or may not correspond with the individual's sex assigned at birth."  *Id.*

47.    Policy JB provides:

> The Board is committed to the policy that no otherwise qualified student shall be excluded from participation in, be denied the benefits of, or be subject to discrimination under any district program or activity on the basis of disability, race, creed, color, national origin, sex, sexual orientation, gender expression, gender identity, pregnancy, marital status, religion,

ancestry, age, genetic information, need for special education services, or any other applicable status protected by federal, state or local law ("protected status").

Ex. L at 2.

    a. Policy JB references applicable Colorado state law that prohibits discrimination on the basis of gender identity. *Id.* at 3.

48.    The "Restroom Accessibility" section of Policy JB-R2 provides:

Students shall have access to the restroom that corresponds to their gender identity consistently asserted at school. Any student who has a need or desire for increased privacy, regardless of the underlying reason, should be provided access to a single stall restroom, but no student shall be required to use such a restroom.

Ex. M at 3.

49.    The "Locker Room Accessibility" section of Policy JB-R2 provides:

The use of locker rooms by students who are transgender and gender nonconforming shall be assessed on a case-by-case basis with the goals of maximizing the student's social integration and equal opportunity to participate in physical education classes and sports, ensuring the student's safety and comfort, and minimizing stigmatization of the student. In most cases, students who are transgender should have access to the locker room that corresponds to their gender identity consistently asserted at school.

Any student who has a need or desire for increased privacy, regardless of the underlying reason, should be provided with a reasonable alternative changing area such as the use of a private area (e.g., a nearby restroom stall with a door, an area separated by a curtain, a P.E. instructor's office in the locker room, or a nearby health office restroom), or with a separate changing schedule (e.g., using the locker room that corresponds to their gender identity before or after other students). Any alternative arrangement should be provided in a way that allows the student's transgender status to be kept confidential. In no case shall a student who is transgender be required to use a locker room that conflicts with the student's gender identity consistently asserted at school.

*Id.* at 3–4.

50.    The "Overnight Activity and Athletic Trips" section of Policy JB-R2 provides:

In the planning of sleeping arrangements during overnight activity and athletic trips, the needs of students who are transgender shall be assessed on a case-by-case basis with the goals of maximizing the student's social integration, providing equal opportunity to participate in overnight activity and athletic trips, ensuring the student's safety and comfort, and minimizing stigmatization of the student.  In most cases, students who are transgender should be assigned to share overnight accommodations with other students that share the student's gender identity consistently asserted at school.  Any alternative arrangement should be provided in a way that allows the student's transgender status to be kept confidential.  Under no circumstance shall a student who is transgender be required to share a room with students whose gender identity conflicts with their own.

*Id.* at 4.

51.    The "Physical Education and Intramural and Interscholastic Athletics"

section of Policy JB-R2 provides:

Students should be permitted to participate in physical education classes and intramural sports in a manner consistent with their gender identity.  With regard to interscholastic activities, the district will follow the CHSAA Transgender Policy.

*Id.*

52.    The Colorado High School Activities Association ("CHSAA") Transgender

Inclusion Bylaw & Policy provides:

The Colorado High School Activities Association recognizes the right of transgender student-athletes to participate in interscholastic activities free from unlawful discrimination based on sexual orientation.  In order to insure appropriate gender assignment for purposes of athletic eligibility, a transgender student-athlete's home school will perform a confidential evaluation to determine the gender assignment for the prospective student-athlete.  The CHSAA will review athletic eligibility decisions based on gender assignment of transgender student-athletes in accordance with its approved policies and appeals procedures.

Ex. N at 2.

**V.     The Department Has Interpreted Title IX to Prohibit Inclusive Policies for Transgender Students Without Going Through Notice-and-Comment Rulemaking.**

53.     Title IX of the Higher Education Amendments of 1972, Pub. L. No. 92-318, provides in pertinent part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a)(1).

54.     To enforce Title IX, Congress "authorized and directed" every federal agency providing financial assistance to education programs or activities to "effectuate the provisions of [20 U.S.C. § 1681] . . . by issuing rules, regulations, or orders of general applicability."  20 U.S.C. §1682.

55.     The Department of Education's regulations state that recipients "*may* provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex."  34 C.F.R. § 106.33 (emphasis added).  The regulations separately provide that recipients "*may* operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport."  34 C.F.R. § 106.41(b) (emphasis added).  Neither the statute nor these regulations require sex-separation; they simply permit it.  And while the Supreme Court concluded in *West Virginia v. B.P.J.*, 604 U.S. ___, No. 24-43 (June 30, 2026), that a state *may* limit girls' sports participation based on birth sex, *id.*, slip op. at 10, the Court did not go so far as to hold that Title IX *requires* separation of facilities and

athletics teams on that basis, *id.* at 3 n.1. Yet the Administration is now enforcing the position that Title IX prohibits schools from allowing transgender girls to access girls' facilities and athletics—a substantive legal standard that has never been adopted through notice-and-comment rulemaking.

56.    Prior to this administration's new approach, the Department of Education certified compliance for educational institutions whose policies prohibited discrimination based on gender identity, as Jeffco's have since 2013. During that period, the Title IX regulations were not interpreted as requiring schools to restrict access and participation to sex assigned at birth, and the Department of Education entered into resolution agreements with school districts whose practices were consistent with Jeffco's current approach. In a complete reversal, the Administration is now seeking to penalize Jeffco for those same policies—without notice-and-comment rulemaking or a reasoned explanation for the reversal.

57.    In May 2016, the Department of Education and the Department of Justice issued a joint Dear Colleague letter stating that Title IX's prohibition of sex discrimination "encompasses discrimination based on a student's gender identity, including discrimination based on a student's transgender status."[7] The 2016 guidance directed schools to treat students consistent with their gender identity, including with respect to restrooms, locker rooms, and athletics. *Id.*

---

[7] *Dear Colleague Letter on Transgender Students*, U.S. DEP'T OF EDUC., OFFICE FOR CIVIL RIGHTS & U.S. DEP'T OF JUSTICE, CIVIL RIGHTS DIVISION (May 13, 2016), https://www.justice.gov/opa/file/850986/dl.

58.     In February 2017, the Department of Education and the Department of Justice jointly withdrew the 2016 Dear Colleague letter and expressly deferred to states: "[T]here must be due regard for the primary role of the States and local school districts in establishing educational policy."[8]   The 2017 withdrawal did not mandate that recipients exclude transgender girls from girls' facilities, accommodations, or teams—it left the question to state and local discretion.  *See id.*

59.     In the preamble to the 2020 Title IX regulations, the Department of Education expressly declined to adopt a definition of "sex."  The 2020 Title IX regulations did not require recipients to exclude transgender girls from girls' facilities, accommodations, or athletic teams as a condition of compliance.  To the contrary, the preamble supports the position that transgender students are protected by Title IX.   *See* 85 Fed. Reg 30026, 30064 (May 19, 2020) ("[T]he Department believes that, contrary to commenters' assertions, the final regulations will help protect against sex discrimination regardless of a person's race or ethnicity, age, sexual orientation, or gender identity."); *id.* at 30179 ("The Department will not tolerate sexual harassment as defined in § 106.30 against any student, including LGBTQ students."); *id.* at 30479 ("The Department believes that these final regulations provide the best protections for all persons, including women and people who identify as LGBTQ, in an education program or activity of a recipient of Federal financial assistance who experience sex discrimination, including sexual harassment.").

---

[8] *Dear Colleague Letter*, U.S. DEP'T OF EDUC., OFFICE FOR CIVIL RIGHTS & U.S. DEP'T OF JUSTICE,     CIVIL     RIGHTS     DIVISION     (Feb.     22,     2017), https://www.ed.gov/media/document/colleague-2017-title-ix-35085.pdf.

60.    In June 2021, under the Biden Administration, the Department of Education issued a Notice of Interpretation announcing that it would "fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity in education programs and activities that receive Federal financial assistance from the Department."  86 Fed. Reg. 32637 (June 22, 2021).  The 2021 Notice of Interpretation was vacated nationwide by the United States District Court for the Northern District of Texas in *Texas v. Cardona*, 743 F. Supp. 3d 824 (N.D. Tex. 2024), and was preliminarily enjoined in 20 additional states by the Eastern District of Tennessee in *Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807 (E.D. Tenn. 2022), *aff'd*, 104 F.4th 577 (6th Cir. 2024).

61.    In April 2024, the Department of Education adopted the 2024 Title IX Rule through notice-and-comment rulemaking, revising 34 C.F.R. § 106.31 to provide that policies preventing a person from participating in an education program consistent with the person's gender identity subject that person to more than de minimis harm on the basis of sex.  89 Fed. Reg. 33474 (Apr. 29, 2024).  On January 9, 2025, the United States District Court for the Eastern District of Kentucky vacated the 2024 Title IX Rule nationwide.  *State of Tennessee v. Cardona*, 762 F. Supp. 3d 615 (E.D. Ky. 2025).

62.    The Administration's current enforcement campaign is the fourth major shift in the Department of Education's interpretation of Title IX in the last ten years.  The 2016 guidance required schools to treat students consistent with gender identity, the 2017 withdrawal deferred to states, the 2021 interpretation and 2024 Title IX rule again required protection for transgender students, and the current position mandates exclusion.

63.     On June 30, 2026, the Supreme Court decided *West Virginia v. B.P.J.*, 604 U.S. ___, No. 24-43 (June 30, 2026), holding that neither Title IX nor the Equal Protection Clause prohibits school policies that exclude transgender girls from participating on girls' sports teams.  But the Court did not hold that Title IX *requires* such separation.  To the contrary, the opinion expressly reserved the "distinct question of whether, under Title IX and the Equal Protection Clause, schools may *allow*" transgender girls to participate on girls' sports teams, stating that "[n]othing in this opinion is intended to decide that question."  *West Virginia v. B.P.J.*, 604 U.S. ___, No. 24-43, slip op. at 3 n.1 (June 30, 2026).  The Administration's enforcement position—that Title IX *prohibits* schools from allowing transgender girls to access girls' facilities and athletics—was not decided by *B.P.J.* and remains an open question that the Department can only resolve by going through notice-and-comment rulemaking.

**VI.     The Department Has Bypassed Notice-and-Comment Rulemaking in Adopting Its Position that Title IX Prohibits Schools from Allowing Transgender Students Access to Facilities and Athletics.**

64.     The APA and the General Education Provisions Act ("GEPA") require the Administration to follow notice-and-comment rulemaking procedures when adopting rules guiding its enforcement of Title IX.  *See* 5 U.S.C. § 553; 20 U.S.C. § 1232.  Under the APA, a "legislative rule" that has the force and effect of law must go through notice-and-comment procedures before taking effect.  5 U.S.C. § 553.

65.     The Administration has unilaterally changed its policy position without pursuing the requisite rulemaking process.  On January 20, 2025, President Trump issued Executive Order 14168, *Defending Women from Gender Ideology Extremism and*

*Restoring Biological Truth to the Federal Government*, which compelled all agencies and departments within the Executive Branch to "enforce all sex-protective laws to promote [the] reality" that there are "two sexes, male and female," and that "[t]hese sexes are not changeable and are grounded in fundamental and incontrovertible reality."[9]  President Trump also ordered that "[e]ach agency head shall promptly rescind all guidance documents inconsistent with the requirements of this order."  *Id.*

66.    On February 4, 2025, OCR issued the Title IX Enforcement Directive, stating that "ED and OCR must enforce Title IX consistent with [EO 14168]."[10] It explained that "[i]n light of the recent federal court decision vacating the 2024 Title IX Rule, and consistent with President Trump's *Defending Women* Executive Order, the binding regulatory framework for Title IX enforcement includes the principles and provisions of the 2020 Title IX Rule and the longstanding Title IX regulations outlined in 34 C.F.R. 106 *et seq*., but excludes the vacated 2024 Title IX Rule."  *Id.*  The Directive does not acknowledge that the Administration is departing from its prior enforcement position that Title IX covers gender identity discrimination.

67.    On February 5, 2025, President Trump issued Executive Order 14201, *Keeping Men Out of Women's Sports*, which invokes Title IX and prohibits students from participating on school sports team that align with their gender identity.[11]

---

[9] *See supra* note 1.

[10] *Dear Colleague Letter: Title IX Enforcement Directive*, U.S. DEP'T OF EDUC., OFFICE FOR CIVIL RIGHTS (Feb. 4, 2025), https://www.ed.gov/media/document/title-ix-enforcement-directive-dcl-109477.pdf.

[11] Exec. Order 14201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9279 (Feb. 11, 2025), https://www.govinfo.gov/content/pkg/FR-2025-02-11/pdf/2025-02513.pdf.

68.     The Administration's current enforcement position—that Title IX prohibits schools from allowing transgender girls to access girls' facilities or participate on girls' sports teams—was not adopted through notice-and-comment rulemaking.  This position was instead announced through Executive Orders 14168 and 14201 and subsequent subregulatory guidance documents, including the February 2025 Title IX Enforcement Directive.  No Federal Register notice was published, no public comment period was provided, and no final rule was issued codifying this position in the Code of Federal Regulations.

69.     The Administration then implemented its new enforcement position through a pattern of escalating enforcement actions.   Since the February 2025 Title IX Enforcement Directive, OCR has opened approximately 60 investigations into schools across more than 20 states that allow transgender girls to access girls' facilities and participate on girls' athletic teams, issued noncompliance findings based on its enforcement position, executed binding resolution agreements requiring recipients to exclude transgender girls from girls' teams and issue "personalized letter[s] of apology" to impacted athletes, placed school districts on high-risk status with immediate reimbursement obligations, discontinued multi-million-dollar grants, rescinded prior resolution agreements, and referred matters to the Department of Justice for enforcement proceedings.

70.     The uniformity of these enforcement actions confirms the legislative character of the Administration's position.  Rather than engaging in individualized, case-by-case adjudication, OCR has applied the same Title IX interpretation to universities and

K-12 districts, athletics and facilities with policies allowing transgender girls to access girls' facilities or participate on girls' athletics teams. This pattern demonstrates that the Administration is enforcing a generally applicable rule—one that required notice-and-comment rulemaking before it could be imposed on recipients of federal funding.

71.    OCR's Letter of Impending Enforcement Action warns that if Jeffco does not enter into a resolution agreement within ten days, the Administration will "initiate administrative proceedings to suspend, terminate, or refuse to grant or continue and defer" federal funding, or refer the matter to the Department of Justice for litigation. Ex. I. The Administration has followed through on this threat against other recipients. For example, OCR referred the Minnesota Department of Education to the Department of Justice for enforcement litigation on January 26, 2026, and the Department of Justice filed a lawsuit on March 30, 2026.[12] The Administration announced its investigation into the Maine Department of Education on February 21, 2025, issued its noncompliance finding on March 19, 2025, referred Maine to the Department of Justice on April 11, 2025, and the Department of Justice filed suit on April 16, 2025.[13] The Administration announced that its Title IX Special Investigations Team was investigating the California

---

[12] *U.S. Departments of Education and Health and Human Services Refer Minnesota Case to U.S. Department of Justice for Title IX Non-Compliance,* U.S. DEP'T OF EDUC. (Jan. 26, 2026), https://www.ed.gov/about/news/press-release/us-departments-of-education-and-health-and-human-services-refer-minnesota-case-us-department-of-justice-title-ix-non-compliance; Compl., *United States v. Minnesota Dep't of Educ.*, No. 26-cv-02078 (D. Minn. Mar. 30, 2026), ECF 1.

[13] *U.S. Department of Education Announces Consequences for Maine's Title IX Noncompliance*, U.S. DEP'T OF EDUC. (Apr. 11, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-announces-consequences-maines-title-ix-noncompliance; Compl., *United States v. Maine Dep't of Educ.*, No. 1:25-cv-00173 (D. Me. Apr. 16, 2025), ECF 1.

Department of Education, and the California Department of Education and California Interscholastic Federation received noncompliance findings on June 25, 2025; the Department of Justice filed suit on July 9, 2025.[14]  After initiating investigations into four Kansas school districts, OCR issued Letters of Impending Enforcement Action to three of those districts on June 11, 2026, and on July 1, the Administration announced that it had referred those districts to the Department of Justice.[15]

72.    The Administration has also discontinued grant funding to recipients that refused to comply with its demands.  In October 2025, the Administration discontinued the New York City Department of Education's Magnet School Assistance Program ("MSAP") grants, cutting off access to $11 million in federal funds.  New York City sued, and the court granted summary judgment in its favor, finding that the Administration violated Title IX's statutory procedures by bypassing notice, hearing, and congressional reporting requirements before refusing funding.[16]  The City of Chicago filed a similar lawsuit in March 2026 after the Administration discontinued its MSAP funding; that case

---

[14] *U.S. Department of Education Finds California Department of Education and California Interscholastic Federation in Violation of Title IX*, U.S. DEP'T OF EDUC. (June 25, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-finds-california-department-of-education-and-california-interscholastic-federation-violation-of-title-ix; Compl., *United States v. California Interscholastic Federation*, No. 8:25-cv-01485 (C.D. Cal. July 9, 2025), ECF 1.

[15] *U.S. Department of Education Takes Action Against Four Kansas School Districts for Continued Violations of Title IX*, U.S. DEP'T OF EDUC. (June 11, 2026), https://www.ed.gov/about/news/press-release/us-department-of-education-takes-action-against-four-kansas-school-districts-continued-violations-of-title-ix.

[16] *Bd. of Educ. of City Sch. Dist. Of N.Y. v. U.S. Dep't of Educ.*, 2026 WL 948205 (S.D.N.Y. Apr. 8, 2026) (granting summary judgment for NYC and vacating discontinuation of MSAP grants), *appeal withdrawn*, No. 26-1602 (2d Cir. June 18, 2026).

remains pending.[17]  These cases confirm that the Administration's enforcement actions have immediate financial consequences.

73.     Because the Administration's enforcement position—that Title IX prohibits schools from allowing transgender girls to access girls' facilities and participate on girls' athletics teams—operates as a legislative rule, imposing new binding obligations on funding recipients with immediate legal and financial consequences, it required notice-and-comment rulemaking before taking effect.  The Administration bypassed that requirement.  Regardless of whether the Administration's substantive position on Title IX is correct, it cannot enforce this prohibition as binding law without following the procedures prescribed by the APA and GEPA.

## VII.   Colorado Law Supersedes Executive Pronouncements that Conflict with Clear Provisions.

74.     The Administration's new enforcement position is contained in executive orders and subregulatory guidance documents that have not been codified through notice-and-comment rulemaking.  These subregulatory actions do not have the force of law and cannot preempt clear provisions of state statutes.

75.     CADA prohibits discrimination on the basis of gender identity in places of public accommodation, including educational institutions.   CO Rev. Stat. § 24-34-601(2)(a).  This is a clear and unambiguous state law obligation that binds Jeffco.

76.     Executive Orders 14168 and 14201 and the Administration's February 2025 Title IX Enforcement Directive cannot supersede CADA because they were not adopted

---

[17] Corrected Compl., *Bd. of Educ. of the City of Chicago v. U.S. Dep't of Educ.*, No. 1:26-cv-02795 (N.D. Ill. Mar. 13, 2026), ECF 4.

through the procedures required to give them the force of law. Whatever Title IX ultimately requires, Jeffco cannot be compelled to violate binding state law based on executive orders and subregulatory guidance that have not been subject to public notice and comment. "[E]xecutive guidance and agency findings, in and of themselves, do not reflect settled law." *Female Athletes United v. Ellison,* 172 F.4th 1019, 1029 (8th Cir. 2026).

77.    Confirming this point, the Colorado Supreme Court recently held that Colorado entities must comply with CADA's anti-discrimination protections and cannot abandon those obligations merely because of a subregulatory agency pronouncement. *Boe v. Children's Hospital Colorado*, 589 P.3d 478, 491 (Colo. 2026). There, Children's Hospital sought to use the threat of enforcement action against it by a federal agency as a reason to violate Colorado law relating to gender identity. *Id.* But the Colorado Supreme Court held that such informal announcements by federal agencies do not excuse compliance with Colorado law. *Id. Boe* makes clear that Colorado law continues to protect gender identity regardless of the Administration's current non-binding interpretation of Title IX, which was adopted without adequate process.[18]

---

[18] The trial court issued a preliminary injunction on June 11, 2026, and on June 29, 2026, issued a citation ordering the hospital to show cause why sanctions should not be imposed for its continued refusal to comply. A contempt hearing took place July 20, 2026. Zach Dupont, *Hospital that Halted Gender Care Must Show Cause*, LAW360 (June 29, 2026), https://www.law360.com/health/articles/2495047.

**VIII.    The Department's Letter of Impending Enforcement Action Threatens Jeffco's Rights and Poses Harm.**

78.    By not complying with the Defendants' demands, Jeffco faces significant legal and financial consequences.  Jeffco is "trapped between choosing to enforce state laws or receiving federal funds."  *Tennessee v. Dep't. of Educ.*, 104 F.4th 577, 591 (6th Cir. 2024) (cleaned up).

79.    Defendants' issuance of the Letter of Impending Enforcement Action threatens Jeffco with administrative proceedings to suspend or terminate federal financial assistance.  Title IX allows the Department of Education to suspend or terminate federal education funding if Jeffco does not achieve voluntary compliance.  20 U.S.C. § 1682; 34 C.F.R. § 100.8(a).  Jeffco receives roughly $52 million in federal funding to support its student population of nearly 75,000 students.  Such loss of funding would constitute a "severe" penalty, *Cannon v. Univ. of Chicago*, 441 U.S. 677, 705 (1979), and would be detrimental to Jeffco's ability to serve its students.  Jeffco "need not assume such risks while waiting for [an agency] to drop the hammer."  *U.S. Army Corps of Eng'rs v. Hawkes Co.,* 578 U.S. 590, 600 (2016) (cleaned up).

80.    The Administration also threatens to refer the matter to the Department of Justice, putting Jeffco at further risk of injury.  *See Tennessee*, 104 F.4th at 589.  "[P]arties need not await enforcement proceedings before challenging final agency action where such proceedings carry the risk of serious criminal and civil penalties."  *U.S. Army Corps of Eng'rs*, 578 U.S. at  600 (cleaned up).

81.    Jeffco's injuries constitute irreparable harm.  In the absence of relief, Jeffco will be forced to lose essential federal funding or comply with the Administration's

demands contrary to its own policies and state law, and it is "likely to incur unrecoverable compliance costs." *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023).

82.    Colorado law requires Jeffco to maintain Policy AC and Policy JB-R2, and the Colorado Supreme Court recently clarified that subregulatory federal policy pronouncements do not preempt state law. *See Boe v. Children's Hospital Colorado*, 589 P.3d 478 (Colo. 2026).  If Jeffco were to rescind its policies and agree to the terms of the Proposed Resolution Agreement, it would face potential action by the Colorado Attorney General and private actions by students and parents for violating CADA.

83.    Defendants have demonstrated that they do not intend to modify the terms of the Proposed Resolution Agreement and will move forward with an administrative proceeding or referral to the Department of Justice if Jeffco does not execute the Resolution Agreement as proposed.

84.    Jeffco's injuries are traceable to the challenged action of the Defendants and will be redressed by a favorable ruling setting aside the Defendants' actions. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

85.    The Defendants' actions have been widely reported, in part due to the Defendants' inflammatory and inaccurate press releases.  The attention to this issue and untenable position faced by Jeffco have caused great distress among Jeffco families and staff.  Jeffco students and staff are uncertain as to what rules will apply to their access to facilities and athletics when school resumes this fall and whether they will have sufficient funding to support their educational programs and activities.  Jeffco staff have been subjected to harassing calls, emails, and online vitriol based on falsehoods.  Jeffco

schools are committed to ensuring every student's right to equal educational opportunities and protecting the well-being and dignity of all Jeffco students.  The Defendants' attempt to force Jeffco to violate state law and abandon these core tenets has already undermined community trust, created uncertainty for students and families, and diverted critical resources away from Jeffco's educational mission.

## CAUSES OF ACTION

### Count I – Under the Administrative Procedure Act–5 U.S.C. § 706(2)(A)
### Arbitrary and Capricious
### (Against All Defendants)

86.    Jeffco repeats and realleges paragraphs 1–85 as though fully set forth herein.

87.    Congress expressly declared that any action by a department or agency "terminating or refusing to grant or to continue financial assistance" is subject to judicial review under the APA, that "any State" may obtain judicial review, and that the federal agency's action "shall not be deemed committed to unreviewable agency discretion."  20 U.S.C. § 1683.

88.    Agency action is final when it marks the consummation of agency decisionmaking and determines rights or obligations or creates legal consequences. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

89.    The Board of Education of Jefferson County School District Re-1 is the governing body of Jefferson County School District, a local government entity in the State of Colorado.

90.    Defendants' issuance of the Letter of Impending Enforcement Action, culminating a process that included a Letter of Findings, Proposed Resolution Agreement, and Letter of Impasse, all premised on Defendants' assertion that Jeffco violated Title IX, constitute a final agency action reviewable under the APA.  20 U.S.C. § 1683; *see e.g.*, *Dekovic v. Rubio*, 169 F.4th 1002, 1012 (10th Cir. 2026); *State of Tennessee v. Dep't of Educ.*, 104 F.4th 577, 599 (6th Cir. 2024); *Cure Land, LLC v. U.S. Dep't of Agriculture*, 833 F.3d 1223, 1231 (10th Cir. 2016); *Kobach v. U.S. Elec. Assistance Comm'n*, 772 F.3d 1183, 1189–90 (10th Cir. 2014).

91.    The APA requires that the Court "hold unlawful and set aside agency action, findings, and conclusions found to be… arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  An agency action is arbitrary and capricious where it is not "reasonable and reasonably explained."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

92.    Defendants' actions are arbitrary and capricious in several respects.

93.    First, Defendants based their Findings and Letter of Impending Enforcement Action on demonstrably incorrect facts, including that Jeffco allows 61 boys to participate on girls' sports teams.  Despite Jeffco's repeated explanations that those 61 students were not competing members of the team but rather individuals serving in supporting roles (i.e. trainers, mascots, and team managers), Defendants have refused to change their position.  An agency action premised on false factual findings is not reasonable.

94. Second, Defendants' only other cited factual "basis" for its conclusion was unproven allegations in pending litigation to which the Department is not even a party. That case, *Wailes v. Jefferson County Public Schools*, No. 1:24-cv-02439 (D. Colo. 2024), was dismissed by the district court in August 2025. An appeal is pending, but the district court has not made any factual findings regarding those allegations, nor did OCR conduct its own investigation into those underlying facts through interviews or any other means. An agency action premised on unproven allegations in private party litigation is not reasonable.

95. Third, Defendants pointed to a partial settlement agreement in third-party litigation, *School District 49 v. Sullivan*, 25-CV-1463 (D. Colo.), in concluding that Jeffco's "representations to us might have been inaccurate." That partial settlement agreement was reached five months *after* Jeffco's response to OCR's data request and litigation with the other parties is ongoing. Jeffco could not have been responsible for providing OCR with an amended response because Jeffco was not a party to that litigation, nor had it received a copy of the partial settlement agreement. An agency action premised on a settlement agreement that a recipient is not bound by, a party to, or does not even have is not reasonable.

96. Fourth, Jeffco requested OCR's assistance in resolving the conflict between the Proposed Resolution Agreement and Jeffco's obligations under CADA. Rather than engaging with Jeffco's requests, OCR declared an impasse the day before discussions were to occur and before the negotiation window set forth in the Case Processing Manual closed. Defendants' decision to issue a Letter of Impending Enforcement Action without

engaging in discussions to resolve these important issues was arbitrary.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (an agency that "entirely fail[s] to consider an important aspect of the problem" has acted arbitrarily).

97.    Fifth, Defendants did not conduct a proper investigation before issuing their Findings.  Defendants did not contact Jeffco once in the approximately eight-month period between Jeffco's timely and complete response to the data request and Defendants' issuance of the Letter of Findings.  Defendants did not interview any Jeffco staff or students, conduct any site visits, or seek clarification or confirmation of any of the data provided by Jeffco.  Instead, Defendants cited incorrect factual findings and unproven allegations in third party litigation as factual support.  As explained above, Defendants did not even attempt to correct errors in their factual findings upon Jeffco's clarification, nor did Defendants attempt to discuss with Jeffco how it believed the partial settlement agreement in the *Sullivan* case applied to Jeffco.  The Defendants' incomplete investigation resulted in the finding of a Title IX violation, which relied on an interpretation of that statute that is not binding law.  Defendants' actions were far from "reasonably explained." *Prometheus Radio Project*, 592 U.S. at 423.

98.    Sixth, Defendants' actions impose unwarranted penalties on Jeffco not because Jeffco has violated any law but because Jeffco is following Colorado state law, which has bound Jeffco since at least 2013 when Jeffco's policies were enacted.  The Administration has not provided any explanation for why it has abruptly departed from the agency's prior enforcement posture, deeming its actions unreasonable.

99.    Seventh, OCR declared an impasse in the midst of Jeffco's repeated attempts at good-faith negotiation.   During multiple meetings discussing the errors mentioned above, OCR committed to providing follow-up information.   Jeffco waited, in good faith, to receive such information, as it was crucial to Jeffco's ability to evaluate and respond to OCR's Proposed Resolution Agreement.   Jeffco was blindsided when OCR abruptly threatened Jeffco with impasse without having provided that information and demanded that Jeffco acquiesce to the demands of the Proposed Resolution Agreement prior to the next scheduled meeting, which both parties had agreed upon to discuss many of the outstanding questions Jeffco raised in good faith.   Defendants' failure to engage in good faith discussions to obtain accurate information from Jeffco renders its actions unreasonable.   *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.") (cleaned up).

100.    Eighth, Defendants' actions single out Jeffco, while ignoring similarly situated districts in Colorado and across the country that have similar policies regarding student access to facilities and sports teams.   Defendants have not articulated a sufficient and substantiated reason to explain why Jeffco is subject to this action while others are not.   This disparate treatment, without a rational basis, violates the fundamental principle that agency action must be based on reasoned decision-making.   *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.   Agency discretion is not unbounded, and selective enforcement without justification renders Defendants' action arbitrary and capricious and an abuse of discretion.   *See Kirk v. Comm'r of SSA*, 987 F.3d 314, 321 (4th Cir. 2021) ("Where an

agency applies different standards to similarly situated entities and fails to support this disparate treatment with a reasoned explanation and substantial evidence in the record, its action is arbitrary and capricious and cannot be upheld.") (quoting *Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 777 (D.C. Cir. 2005)).

101. Ninth, the federal funds at risk are wholly disconnected from the alleged Title IX violation, as Jeffco does not receive any federal assistance earmarked for Title IX. Conditioning continued receipt of federal funds appropriated under wholly independent statutes—including the Elementary and Secondary Education Act, 20 U.S.C. § 6301 *et seq.*, and the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*—on the adoption of a sex-separation policy that neither those statutes nor Title IX's implementing regulations have ever required is arbitrary and capricious.

102. Defendants' actions must be held unlawful and set aside as arbitrary and capricious and an abuse of discretion. 5 U.S.C. § 706(2)(D).

### Count II – Under the Administrative Procedure Act–5 U.S.C. § 706(2)(A)
### Violation of Notice and Comment Procedures
### (Against All Defendants)

103. Jeffco repeats and realleges paragraphs 1–102 as though fully set forth herein.

104. The APA requires courts to "hold unlawful and set aside agency action" that they find to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

105. Agencies must proceed through the notice and comment process before engaging in rulemaking. *See* 5 U.S.C. § 553. They must, among other requirements,

publish a notice of proposed rulemaking in the Federal Register and provide interested persons an opportunity to comment.

106.    Defendants' Letter of Findings and Letter of Impending Enforcement Action announces and applies what amounts to a new legislative rule: that Title IX *prohibits* schools from allowing transgender girls to access girls' facilities and participate on girls' sports teams.    This enforcement position was never adopted through notice-and-comment rulemaking; it was announced through Executive Orders 14168 and 14201 and the subregulatory February 2025 Title IX Enforcement Directive.    No Federal Register notice was published, no public comment period was provided, and no final rule was issued codifying this position in the Code of Federal Regulations.

107.    The Administration's enforcement position that Title IX prohibits schools from allowing transgender girls to access girls' facilities and participate on girls' sports teams is a legislative rule under governing precedent.    "A rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy."  *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014); *accord Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 620 (4th Cir. 2018).    This position satisfies each of these criteria: it supplements Title IX by imposing a prohibition Congress did not enact; it adopts a position inconsistent with the Department of Education's 2020 regulations, which indicated that Title IX protects transgender students, *see* 85 Fed. Reg at 30064 ("[T]he Department believes that, contrary to commenters' assertions, the final regulations will help protect against sex discrimination regardless of a person's race or ethnicity, age,

sexual orientation, or gender identity."); *id.* at 30179 ("The Department will not tolerate sexual harassment as defined in § 106.30 against any student, including LGBTQ students."); *id.* at 30479 ("The Department believes that these final regulations provide the best protections for all persons, including women and people who identify as LGBTQ, in an education program or activity of a recipient of Federal financial assistance who experience sex discrimination, including sexual harassment."); and it effects a substantive change by prohibiting funding recipients from permitting transgender girls access girls' facilities and participate on girls' athletics teams—the very practice the Department of Education previously implemented as a Title IX remedy.

108.    The uniformity of the Administration's enforcement actions confirms the legislative character of its new position.  Since announcing the February 2025 Title IX Directive, the Administration has opened more than 60 investigations in more than 20 states, issued noncompliance findings, executed binding resolution agreements, placed school districts on high-risk status with immediate reimbursement obligations, discontinued multi-million-dollar grants, and referred matters to the Department of Justice for enforcement litigation—all based on its new Title IX rule.  The consistency of this approach marks a generally applicable rule, not case-by-case enforcement.

109.    If Defendants had conducted the notice and comment process, Plaintiffs would have submitted comments opposing any rule that prohibited them from treating transgender girls as girls.

110.    Jeffco has been deprived of its right to participate in the rulemaking process because Defendants ignored the law and forewent the notice and comment requirements.

Now, Jeffco's federal funding is at risk because of alleged violations of the Department's unilateral interpretation of Title IX.

111.    The APA's notice-and-comment requirement is designed to protect against precisely this kind of federal overreach.  "Notice and comment give affected parties fair warning of potential changes in the law and an opportunity to be heard on those changes—and it affords the agency a chance to avoid errors and make a more informed decision."  *Tennessee*, 615 F. Supp. 3d at 838 (cleaned up).  The Defendants' bypass of these procedures is particularly egregious where, as here, the Administration is conscripting local school districts to administer federal education policy in direct conflict with binding state law—forcing Jeffco to choose between violating Colorado law or losing federal funding.

112.    Because Defendants' actions were conducted "without observance of procedure required by law," Defendants' actions must be held unlawful and set aside.  5 U.S.C. § 706(2)(D).

**Count III** – **Under the Administrative Procedure Act–5 U.S.C. § 706(2)(B) and the Declaratory Judgment Act–28 U.S.C. § 2201**
**Violation of the Spending Clause**
**(Against All Defendants)**

113.    Jeffco repeats and realleges paragraphs 1–112 as though fully set forth herein.

114.    The Court must "hold unlawful and set aside agency action, findings, and conclusions found to be … contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

115.   Article I of the U.S. Constitution specifically grants Congress the power "to pay the Debts and provide for common Defense and general Welfare of the United States."  U.S. Const. art. I, § 8, cl. 1.

116.   Pursuant to the Spending Clause, recipients must be given clear notice of their legal obligations to be held liable for violating them, and the government may not impose post-acceptance or retroactive conditions on funding recipients.  *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999).

117.   "Congress may attach conditions on the receipt of federal funds[.]"  *South Dakota v. Dole*, 483 U.S. 203, 206 (1987).  However, any conditions must be imposed "unambiguously" to enable "States to exercise their choice knowingly, cognizant of the consequences of their participation."  *Id.* at 207 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).  "There can, of course, be no knowing acceptance if a [recipient] is unaware of the conditions or is unable to ascertain what is expected of it."  *Pennhurst*, 451 U.S. at 17.

118.   Defendants' sole authority with respect to the laws of the United States is to "take care that [they] be faithfully executed."  U.S. Const. Art. II § 3; *see also* U.S. Const. amend. X (reserving to the states and the people those powers not delegated to the federal government by the Constitution).  Where Congress may not impose conditions, the Executive similarly may not interpret acts of Congress to impose those conditions consistent with its duty to take care that the laws be faithfully executed.

119.   Defendants' action interprets Congress's grant of funding to Jeffco in a manner that violates the Spending Clause of the U.S. Constitution because Jeffco did not

have clear notice that any federal funding would be conditioned on (1) rescinding Policy AC, Policy JB, and Policy JB-R2 and categorically banning students from accessing facilities in accordance with their gender identity or (2) issuing public statements regarding the meaning of Title IX.

120.   Jeffco accepted federal funding with the understanding that it was required to comply with Title IX and binding judicial precedent interpreting Title IX.  Policy AC, Policy JB, and Policy JB-R2 have been consistent with CADA since 2013.  For more than a decade, Jeffco relied on the Department of Education's prior position that Title IX did not require exclusion of transgender girls, including as reflected in the preamble to the 2020 Title IX regulations.  *See* 85 Fed. Reg at 30064, 30179, 30479.  Throughout that period, the Department of Education did not challenge Jeffco's policies or indicate that compliance with CADA would constitute a Title IX violation.  Jeffco's good-faith compliance with binding state law—at a time when the Department had not adopted any contrary interpretation through notice-and-comment rulemaking—demonstrates that Jeffco lacked the clear notice required before Defendants can condition federal funding on abandonment of those policies.

121.   Under *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009), and *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016), an agency changing course must provide a "more detailed justification" when "its prior policy has engendered serious reliance interests."  The Administration provided no such justification here.  It has not acknowledged Jeffco's reliance on the prior enforcement regime, nor has it explained

why the policies it previously certified as compliant—and affirmatively negotiated as remedies—are now *per se* violations of Title IX.

122.    Congress has not clearly stated, and no court has found, that Title IX *requires* schools to separate students by birth sex in facilities and athletics or *prohibits* schools from maintaining policies like Jeffco's.  While the Supreme Court held in *West Virginia v. B.P.J.*, 604 U.S. ___, No. 24-43 (June 30, 2026), that states *may* limit girls' participation on girls' sports teams based on birth sex, *id.*, slip op. at 10, the Court expressly reserved the question of whether schools may *allow* transgender girls to participate on girls' teams, stating that "[n]othing in this opinion is intended to decide that question."  *Id.*, slip op. at 3 n.1.  This decision underscores Jeffco's lack of clear notice. The Court's express reservation of the question whether schools may *allow* transgender participation confirms that the Administration's current enforcement position—that Title IX categorically prohibits Jeffco's policies—is not compelled by statute, regulation, or judicial precedent.  Moreover, the Colorado Supreme Court recently confirmed in *Boe*, 589 P.3d at 478, that state law is not preempted by subregulatory statements of Federal policy. Jeffco could not have had clear notice of a condition that remains an open question of law.

123.    Defendants have nonetheless threatened Jeffco with an enforcement action that could result in the rescission of federal funds unless Jeffco agrees to abandon its policies and adhere to a new interpretation of Title IX that is directly contrary to prior agency interpretation and governing state law.

124.    Holding Jeffco liable for Title IX violations based on the current state of the law and conditioning future funding on the enforcement of a categorical ban on transgender girls' access to girls' facilities and sports teams violates this limitation on spending power, because, inter alia, Jeffco did not have "clear notice."  *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

125.    Jeffco is separately entitled to a judicial declaration that Defendants' actions lacked proper notice and is contrary to the federal government's power under the Spending Clause.  28 U.S.C. § 2201.

**Count IV – Under the Administrative Procedure Act–5 U.S.C. § 706(2)(B) and the Declaratory Judgment Act–28 U.S.C. § 2201**
**Violation of the First Amendment**
**(Against All Defendants)**

126.    Jeffco repeats and realleges paragraphs 1–125 as though fully set forth herein.

127.    The Court must "hold unlawful and set aside agency action, findings, and conclusions found to be … contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

128.    The First Amendment provides that the federal government "shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  "[A]cademic freedom" is "a special concern of the First Amendment" and receives heightened protection. *Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 603 (1967).  This freedom protects "not only students and teachers, but their host institutions as well."  *Asociacion de Educacion Privada de P.R., Inc. v. Garcia-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007) (cleaned up).  As the Supreme Court has recognized, "[a]cademic freedom thrives not

only on the independent and uninhibited exchange of ideas among teachers and students, but also . . . on autonomous decisionmaking by the academy itself." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 n.12 (1985) (cleaned up). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

129.   Funding conditions that curtail a school district's ability to govern itself or that demand it take institutional positions on contested topics can therefore "result in an unconstitutional burden on First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc. ("AID")*, 570 U.S. 205, 214 (2013). The government cannot "deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

130.   The terms of OCR's Proposed Resolution Agreement "compel" Jeffco to speak the government's "own preferred messages," or else face the "sanction[]" of the loss of federal funding, a Department of Justice investigation, or both. *303 Creative LLC v. Elenis*, 600 U.S. 570, 586, 588–89 (2023). Specifically, the Agreement would require Jeffco to make a public statement adopting the Administration's preferred definitions of the words "sex," "female," "male," "woman," "girl," "man," and "boy" for purposes of all Jeffco policies. *See* Ex. D. The Agreement would also require Jeffco to send letters to certain female athletes "expressing apology on behalf of the District for allowing [their] educational experience and participation in athletics to be marred by sex discrimination."

*Id.* at 4.   The Department made clear that rejecting these terms will result in an enforcement action and put Jeffco's federal funding at risk.

131.   The First Amendment forbids such compelled speech, except when it survives strict scrutiny.   While the government is free to "define the limits of the government spending program," it cannot impose "conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *Agency for Int'l Dev.*, 570 U.S. at 214–15.   Conditioning funding upon Jeffco's agreement to "profess a specific belief" therefore impermissibly compels speech in violation of the First Amendment. *Id.* at 218.

132.   The Letter of Findings and the Proposed Resolution Agreement also trigger strict scrutiny because they are content- and viewpoint-based.   They go far beyond requiring or securing Jeffco's compliance with the law and instead dictate that Jeffco make public statements reflecting specific beliefs about sex and gender.   And unless Jeffco makes these specific statements, in the way the government wants, Jeffco stands to lose critical government funding.

133.   The government "bears the burden of proving the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (citation omitted).   Defendants cannot reasonably argue that the conditions they seek to impose on Jeffco are "the least restrictive means of achieving a compelling [governmental] interest*." Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (citation omitted).

134.   The conditions are overbroad because the statements the government would require of Jeffco do not further any government interest.   Regardless of whether

the Administration's interpretation of Title IX is correct, Jeffco can comply with the law without professing to certain beliefs about sex and gender.

135. The Supreme Court's decision in *West Virginia v. B.P.J.*, 604 U.S. ___, No. 24-43 (June 30, 2026), does not alter this analysis. Although in addressing Title IX's application to transgender sports bans, the Court in *B.P.J.* stated that "sex" in Title IX means "biological sex," *id.*, slip op. at 10, that case's holding is limited to whether Title IX *permits* states to limit girls' and women's sports based on birth sex—it did not hold that the federal government may *compel* school districts to adopt and publicly profess specific beliefs about the definitions of "sex," "male," "female," "woman," "girl," "man," and "boy." The question in *B.P.J.* was whether a state *may* limit sex-separated sports teams by birth sex; the question here is whether the federal government may *force* Jeffco to speak the government's preferred message as a condition of receiving federal funds.

136. Even accepting the *B.P.J.* Court's interpretation of "sex" under Title IX, Jeffco could comply without being compelled to make public statements professing agreement with the Department's preferred definitions and beliefs. The First Amendment prohibits the government from conditioning federal funding on a recipient's public endorsement of particular ideological positions, and nothing in *B.P.J.* suggests otherwise. *See Agency for Int'l Dev.*, 570 U.S. at 218 (government may not condition funding on agreement to "profess a specific belief").

137. The conditions are also overbroad because Defendants have ignored less restrictive alternatives. OCR has not explained why an agreement in which Jeffco agrees

to follow the law, as suggested in Jeffco's redline of the Proposed Resolution Agreement, would not be sufficient.

138. Jeffco's fear that Defendants will initiate an enforcement action, refer the matter to the Department of Justice, or terminate or freeze federal funding, as they have threatened to do, is reasonable in light of the government's prior conduct with other institutions. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 165–66 (2014).

139. Because Defendants' actions in imposing viewpoint-based conditions on Jeffco violate the First Amendment, those actions lack lawful authority. This Court should declare them unconstitutional and vacate and set aside the Letter of Findings, Proposed Resolution Agreement, Letter of Impasse, and Letter of Enforcement Action under 5 U.S.C. § 706(2)(B).

### Count V – Declaratory Judgment Act–28 U.S.C. § 2201
### (Against All Defendants)

140. Plaintiff repeats and realleges paragraphs 1–139 as though fully set forth herein.

141. Plaintiff is therefore entitled to a declaration pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure that the Defendants' Letter of Findings, Proposed Resolution Agreement, Letter of Impasse, and Letter of Enforcement Action rest on arbitrary and capricious decisionmaking, violate notice-and-comment procedures, impose unclear and coercive conditions on federal funding, and violate Jeffco's constitutional rights.

### <u>PRAYER FOR RELIEF</u>

For relief, Jeffco requests that the Court:

a) Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2202, vacate and set aside Defendants' Letter of Findings, Proposed Resolution Agreement, Letter of Impasse, and Letter of Enforcement Action;

b) Pursuant to 28 U.S.C. § 2201, issue a judicial declaration that Defendants' issuance of the Letter of Findings, Proposed Resolution Agreement, Letter of Impasse, and Letter of Enforcement Action violated the APA;

c) Pursuant to 28 U.S.C. § 2201, issue a judicial declaration that Defendants' issuance of the Letter of Findings, Proposed Resolution Agreement, Letter of Impasse, and Letter of Enforcement Action violated the Spending Clause;

d) Pursuant to 28 U.S.C. § 2201, issue a judicial declaration that Defendants' issuance of the Letter of Findings, Proposed Resolution Agreement, Letter of Impasse, and Letter of Enforcement Action violated the First Amendment;

e) Award Plaintiff its reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

f) Grant all other such relief as this Court deems appropriate, just, and proper.

Dated: July 28, 2026

Respectfully submitted,

/s/ *Timothy J. Heaphy*

Timothy J. Heaphy
theaphy@hshw.com
(202) 739-8475
Lindsay Hemminger
lhemminger@hshw.com
(202) 739-8474
HEAPHY SMITH HARBACH & WINDOM, LLP
1701 Pennsylvania Ave. NW, Suite 200
Washington, District of Columbia 20006


Eric Olson
eolson@olsongrimsley.com
(303) 535-9151
Isabel Broer
ibroer@olsongrimsley.com
(303) 535-9151
OLSON GRIMSLEY KAWANABE
HINCHCLIFF & MURRAY, LLC
700 17th Street, Suite 1600
Denver, Colorado 80202


*Counsel for Plaintiff Board of Education of
Jefferson County School District Re-1*