# EXHIBIT B

**To:** C. Trainor, Acting Assistant Secretary for Civil Rights, U.S. Department of Education
**From:** J. Tolleson and J. Rich Fredericks, Jefferson County Public Schools, Denver, CO
**Re:** OCR Case No. 08-25-5902

Dear Mr. Trainor,

Jefferson County Public Schools (Jeffco) received a Notice of Directed Investigation, dated June 2, 2025, which seeks 12 categories of information and documentation. According to the Notice, OCR is investigating the District's promulgation of District Policy JB-R2, "Equal Education Opportunities – Transgender Students" (the Policy),[1] which the Notice alleges "discriminates against female students" by (1) "permitting male students to access bathrooms and locker rooms designated for use by female students," (2) "denying equal athletic benefits and opportunities to female student athletes by permitting males to participate in girls' interscholastic athletics," and (3) "forcing female students to share overnight accommodations with male students during overnight activity and athletic trips."[2]

Jeffco does not discriminate against female students and affirmatively denies all allegations of the Notice. Jeffco's policies and practices relating to student sport participation and facilities access comply with Title IX, the Title IX Regulations, Colorado law, and relevant case law.[3]

## I.    Background.

Jeffco is a high-performing school district located in Jefferson County, Colorado, and an "educational institution" under 20 U.S.C. Section 1681(c), and a place of public accommodation under Colorado law. *See* Section 24-34-601(1), C.R.S. It is Colorado's second-largest school district, with a mission set by its elected board "to provide a world-class education that prepares all Jeffco students for bright and successful futures locally and globally." This mission is achieved through the operation of more than 145 public primary and secondary schools, by Jeffco's 14,000 dedicated employees, for the benefit of more than 75,000 students and their families.

Extracurricular athletic and activity opportunities in the District represent an "extension of the classroom and an important part of [the District's] comprehensive educational philosophy." *See* Student & Family Handbook, 2024-25, p. 27-28. Jeffco's policies comply with

---

[1] The Policy cited in the Notice comprises only part of the District's policies. In particular, JB-R2 expressly builds on and further extrapolates from JB, "Equal Educational Opportunities." JB explicitly relies on, and cites to, multiple sources of legal authority, including Title IX.

[2] While the Notice initially recognizes that "initiation of a directed investigation is not itself evidence of a violation of federal civil rights laws and regulations," it then concludes that partial excerpted language from the Policy is "in irresolvable conflict with Title IX," and goes on to state without citation to either evidence or legal authority that the existence of JB-R2 means that "girls and young women will be, and are being, irreparably harmed on a continuous basis."[2] Not so. The complaint animating this investigation is also untimely and OCR lacks jurisdiction under its own Case Processing Manual. For each of these reasons OCR must dismiss Case No. 08-25-5902, as set forth in its Case Processing Manual at Section 108(a, b, c, d, and f).

[3] Colorado law **requires** that Jeffco provide facilities access consistent with a person's gender identity.

1

applicable federal and state law and adhere to athletic association requirements regarding gender equity in student athletic opportunities and facilities access.

## II.    Authority.

OCR must dismiss an allegation or complaint, when "on its face or as clarified" it (a) "fails to state a violation of one of the laws and regulations OCR enforces," or (b) "lacks sufficient factual detail (e.g. who, what, where, when, and how), or is so speculative, conclusory, or incoherent that OCR cannot infer that discrimination … may have occurred or may be occurring." CPM Section 108(b). Here, OCR's enforcement authority is constrained by the four corners of Title IX, which states that "[n]o person … shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." *Id.* at 20 U.S.C. Section 1681-88.

Jeffco's Policy offers all students–regardless of their sex assigned at birth–the opportunity to access facilities on the same terms. Students participate in sports, access locker rooms, and stay in overnight accommodations during travel based on their gender identity consistently asserted at school. In so doing, Jeffco does not discriminate against cisgendered female students. Requiring the District to amend or revoke the Policy, and to enforce a blanket prohibition to exclude transgender female students from girls' sports, restrooms, locker rooms, and related facilities would single out a sub-set of students for lesser treatment, predicated upon their sex. *See e.g., Bostock v. Clayton County, Ga.*, 590 U.S. 644, 660 (2020) ("If the employer retains an otherwise identical employee, who identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in a student identified female at birth.").[4] Such a requirement would not be consistent with the law, as Jeffco's policy complies with Title IX's mandate that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. Section 1681-88. And it complies with established precedent, requiring equal access be provided to students of all genders.

OCR efforts at enforcing Title IX have been held to rigorous standards during the tenures of administrations across the political spectrum. It should be no different here. For example, when the 2016 DCL was rescinded, OCR did not do so based upon the merits of Title IX affording protections for trans students. It rested its withdrawal on a lack of "extensive legal analysis or explain[ation] how the position is consistent with the express language of Title IX,"

---

[4] Enforcing a policy constraining facilities use based on sex designated at birth is unworkable as most school staff are unlikely to be aware of the sex each student was deemed at birth, and state law also provides that people can amend official documents to reflect their gender identity, including a non-binary identity. *See* Section 25-2-113.8(2)(b), C.R.S. ("An amended birth certificate may be issued to change the sex designation of the person to male, female, or 'X' … [which] is a designation that is neither male nor female."). Relying on ad hoc staff policing of facilities use also presents a risk that students whose gender expression simply does not align with subjective norms are inhibited in their day-to-day access to facilities, which could create a hostile environment for those students, adversely impact their "psychological wellbeing" and distract from their potential "individual [educational] achievement," *Plyler v. Doe*, 457 U.S. 202 (1982), while placing hardworking classroom teachers, custodial and lunchroom staff, and others in an unenviable and legally risky position.

and because the 2016 DCL did not "undergo any formal public process." *See* Dear Colleague Letter (Feb. 22, 2017) (2017 DCL). The same reasoning, coupled with the *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), decision favor circumspection in reliance on the administrative priority articulated in Executive Order 14201, "Keeping Men Out of Women's Sports" (Feb. 5, 2025), as basis for a Title IX enforcement action. Ultimately, in 2017, OCR was prudent in its recognition that "there must be due regard for the primary role of the States and local school districts in establishing educational policy" and advising that "all schools must ensure that all students, including LGBT students, are able to learn and thrive in a safe environment." *See* 2017 DCL.

### III.    Objections.

Jeffco has several concerns that this Investigation does not meet long-standing OCR requirements. As you know, "OCR will ensure that the actions its takes in investigations are legally sufficient, supported by evidence, and dispositive of the allegations." CPM Article III.

**Timeliness.** OCR's investigation here is time-barred. OCR can only act on claims of alleged discrimination "within 180 calendar days of the date of the alleged discrimination." *See* CPM Section 106. As reflected by the Policy itself, it was adopted November 15, 2023, and last revised July 24, 2024, more than 180 calendar days prior to issuance of the Notice, which is dated June 2, 2025.

**Jurisdiction.** OCR lacks jurisdiction to initiate this investigation. OCR Case Processing Manual Section 102 requires that the Department have jurisdiction over a complaint to pursue an investigation. Here, OCR lacks jurisdiction and the investigation must be dismissed "pursuant to Section 108." *See* CPM Section 102(c). The assertion in FN 7 of the CPM that the provisions of Section 108 are inapplicable to directed investigations initiated pursuant to Article IV cannot overcome the basic due process requirement of jurisdiction.

**Failure to follow process and bias.** OCR "may conduct a directed investigation when information indicates a possible failure to comply with the law and regulations enforced by OCR." CMP Section 402. At all times, OCR must serve impartially. CMP Section 202(a). Notwithstanding the CMP's mandate of impartiality and the requirement of basic Due Process, the demonstrates a predetermined result has already been reached despite having neither received nor considered any evidence. The Notice preemptively states that the partial excerpted language from District Policy JB-R2, Equal Education Opportunities – Transgender Students is "in irresolvable conflict with Title IX," before summarily concluding without citation to either evidence or legal authority that the very existence of the District's policy means that "girls and young women will be, and are being, irreparably harmed on a continuous basis."

**The records request is overly broad and unduly burdensome.** Where, as denoted below in Section III, records are not maintained in the manner described by OCR's document request, creating new ones is an unduly burdensome request. Likewise, requests for records dating back to 2023 are overly broad, as the plain language of OCR's CMP Section 106 constrains enforcement authority to those violations alleged to have occurred within 180 calendar days of issuance of the Notice.

### IV.    Response to Request for Documents.

1. The name, title, and contact information for:
   a. The District's point of contact for this investigation; and

   J. Tolleson, Chief Legal Counsel, and/or
   J. Rich Fredericks, Assistant Legal Counsel

   b. Person authorized by the District to resolve this investigation.

   K. LeBlanc-Esparza, Deputy Superintendent

   All available at 1829 Denver Wester Dr. #27, Golden, CO 80401, and (303) 982-6500.

2. A copy of the District's policy describing the definition or meaning of the words "sex," "gender," and/or "gender identity."

   The definition of "gender identity" is found in AC, Nondiscrimination and Equal Opportunity, which established in Colorado law at Section 2-4-401(3.5), C.R.S. *See also* JB, Equal Educational Opportunities; *and see* 34 CFR Part 106 ("The Department understands gender identity to describe an individual's sense of their gender, which may or may not be different from their sex assigned at birth. Courts have used the term consistent with this understanding", *see Bostock*, 590 U.S. at 660, 669; *Parents for Priv. v. Barr*, 949 F.3d 1210, 1217 (9th Cir. 2020); *Whitaker*, 858 F.3d at 1049, sometimes with only a brief explanation, *Grimm*, 972 F.3d at 594 ('gender identity—or their deeply felt, inherent sense of their gender'); *Boyertown Area Sch. Dist.*, 897 F.3d at 522 ('A person's gender identity is their subjective, deep-core sense of self as being a particular gender'); *Schroer v. Billington*, 577 F. Supp. 2d 293, 295 (D.D.C. 2008)"). Neither "sex" nor "gender" are separately defined in Jeffco policy.

3. A copy of the District's policy regarding student use of restrooms, changing rooms, and locker rooms, as well as its policy regarding sharing accommodations during overnight activity and athletic trips.

   JB-R2, Equal Education Opportunities – Transgender Students is the District's only formal, written policy and is publicly available HERE.

   Jeffco has an informal guidance document, a copy of which is attached at Bates No. 000054-000073.

4. A written explanation of what guidance the District relied on or referenced in adopting and enforcing the policies described in paragraphs 2 and 3.

   As part of its education of the more than 75,000 school children of Jefferson County, the District extends the opportunity for students to participate in sport. This access is provided consistent with binding Federal and State of Colorado law, as well as with CHSAA Bylaws.[5]

---

[5] The Policy further aligns with best practices for K-12 restroom and locker room facilities access. *See* Meye, E.J., Leonardi, B., & Keenan, H.B., *Transgender Students and Policy in K-12 Public Schools: Acknowledging Historical Harms and Taking Steps Toward a Promising Future*, National Education Policy Center (Mar. 24, 2022); *and see* Inclusive restrooms & locker rooms in K-12 schools.

**The Policy complies with federal law.**

Where a state has "undertaken to provide an opportunity for an education in its public schools, such an opportunity is a right which must be made available to all on equal terms." *Brown v. Board of Education*, 347 U.S. 483 (1954). And although *Bostock v. Clayton County, Georgia*, 590 U.S. 644 (2019) considered a Title VII discrimination claim, its reasoning also supports Jeffco's decision to treat all students equally, regardless of their sex assigned at birth, when it comes to athletic opportunities and facilities access. Treating transgender female students differently as it regards access to opportunities and facilities would be tantamount to discrimination based on their sex. It is with these binding legal principles in mind that Jeffco established District Policy JB-R2, Equal Education Opportunities – Transgender Students. The Policy extends the chance to join a sport, and access relevant restroom and locker room facilities to all District students "on equal terms" and in doing so avoids imposition of a "deprivation of education" for all students.[6]

Cisgendered females' rights are not violated by the existence of a policy permitting transgendered students to use the restroom and locker rooms aligned with their gender identity. Title IX does not require that an institution provide separate privacy facilities for the sexes, *Doe v. Boyertown Area Sch. Dist.*, 893 F.3d 179, 195 (3rd Cir. 2018), rather it permits that an entity *may* do so, and that if it does that such facilities must be "comparable." The mere presence of a person who is transgender in a women's restroom facility does not rise to the level of a hostile or abusive environment. *See Cruzan v. Special Sch. Dist. # 1*, 294 F.3d 981, 984 (8th Cir. 2002). The presence of transgender students in restrooms and locker rooms neither "infringe[s] on [cisgendered students'] rights under Title IX," nor "offend[s] the constitutional right of privacy any more than the presence of cisgender students in those spaces." *Boyertown Area Sch. Dist.*, 893 F.3d at 183, 194. Indeed, the U.S. Department of Education's Office for Civil Rights itself previously required schools to permit students to use the facilities aligned with their gender identity. The joint Dear Colleague Letter from the Departments of Justice and Education, dated May 13, 2016 (2016 DCL), warned that barring a student from the sex-segregated restroom aligning with their gender identity constituted unlawful sex discrimination.[7]

Categorical bans on transgender female students' participation in public school girls' sports teams and in facilities aligned with their gender identity would violate the Equal Protection Clause of the Fourteenth Amendment, as well as Title IX.[8] *See Hecox v. Little*, 20-

---

[6] *See also Doe ex rel. Doe v. Boyertown Area School District*, 132 Harv. L. Rev. 2058 (May 2019) (Forcing students who are transgender to utilize single-user facilities, rather than permitting them to access the facilities aligned with their gender identity risks "publicly branding all transgender students with a scarlet 'T,' and they should not have to endure that as the price of attending their public school" (internal citations omitted).

[7] Multiple sources of prior Federal guidance are consistent with this view. *See, e.g.,* U.S Department of Education Supporting Transgender Youth in School (June 2021).

[8] *See also* U.S. Equal Emp. Opportunity Comm'n, *Sexual Orientation and Gender Identity (SOGI) Discrimination, https://www.eeoc.gov/sexual-orientation-and-gender-identity-sogi-discrimination* (harassment based on gender identity can create a hostile environment in the workplace); *and see* Notice of Proposed Rulemaking on Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams, 88 FR 22860 (Apr. 13, 2023) (Athletics NPRM) (a categorical ban on transgender students playing sports consistent with their gender identity would not satisfy the proposed regulation, but more

5

35813 (9th Cir. June 7, 2024); *B.P.J. v. West Virginia*, 23-1078 (4th Cir. April 16, 2024). Access to restroom and locker room facilities consistent with student gender identity was upheld in *Boyertown Area School District*, 897 F.3d 518, *cert denied*, where the court reasoned that "even if the [policy] implicated [a student's] constitutional right to privacy, the state had a compelling interest in not discriminating against transgender students." *See also Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1052 (7th Cir. 2017) ("[a] transgender student's presence in the restroom provides no more of a risk to other students' privacy rights than the presence of an overly curious student of the same biological sex who decides to sneak glances at [their] classmates.").

Courts have concluded that excluding students from using the restroom and locker room facilities aligned with their gender identity is discriminatory. A school that prohibited a transgender boy from using the boys' restroom was found to have discriminated "on the basis of sex." *See Adams v. Sch. Bd.*, 318 F. Supp. 3d 1293, 1325 (M.D. FL July 26, 2018) (Finding a school district policy excluding a transgender student from using the boy's bathroom was discrimination violated Title IX), *vacated and replaced by Adams v. Sch. Bd.*, 3 F.4th 1299 (11th Cir. 2021) (Affirming decision in favor of transgender student on Equal Protection grounds, "which fully entitle[d] him to [] relief" and thus, declining to reach his Title IX claim), *reversed and remanded by Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022) (en banc) (Deferring to the local district's discretion regarding development of policies regarding transgender students access to restroom facilities, and finding that a policy excluding a transgender student from the boy's bathroom did not violate the law). Here, Jeffco's Policy is narrowly tailored to serve a compelling government interesting in not discriminating against transgender students, and in complying with applicable state law. *See Boyertown Area Sch. Dist.*, 893 F.3d at 190. An administrative directive to the District "to require students to use only facilities that match their biological sex or to use gender-neutral alternative facilities would violate Title IX." *Parents for Privacy v. Dallas Sch. Dist. No. 2*, 326 F.Supp. 3d 1075, 1108 (D. Or. July 24, 2018); *and see Grimm v. Gloucester Cty. Sch. Bd.*, 400 F.Supp. 3d 444, 458 (E.D. Va. Aug. 9, 2019) (Finding that a school district "discriminated against [the student] on the basis of his transgender status in violation of Title IX" when it denied him access to the boys' restroom.). Likewise, "[f]orcing transgender students to use facilities inconsistent with their gender identity would undoubtedly harm those students and prevent them from equally accessing educational opportunities and resources … punish transgender students for their gender nonconformity and constitute a form of sex-stereotyping." *Dallas Sch. Dist.*, 326 F.Supp. 3d at 1108; *see also Boyertown Area Sch. Dist.*, 893 F.3d at 195.

The Policy's permission for any student to access a single-user facilities affords necessary privacy for both trans and cisgendered Jeffco students. No student is compelled by Jeffco to use a facility with a transgender student; rather, the Policy provides the opportunity for transgendered students to use the facilities aligned with their consistently asserted gender identity. In Jeffco–as in *Boyertown*–single-user facilities are available to everyone, thus safeguarding the privacy interests of any student who does not wish to use a shared facility.[9] Students do not "shed their

---

targeted criteria, substantially related to sport, level of competition, and grade or education level, could be permissible).

[9] *See Doe ex rel. Doe v. Boyertown Area School District*, 132 Harv. L. Rev. 2058 (May 2019) (Arguing that the *Boyertown* analysis supports a conclusion that "facilities that adequately shield students' partially

constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines*, 393 U.S. 503 (1969). Moreso, students ought not shed their Fourteenth Amendment right to bodily privacy, when they cross the threshold of their school's football stadium, baseball diamond, or other athletic court. Jeffco's Policy accords this body of caselaw, and the First, Fourteenth, and Title IX rights of all students, in that it does affords all students the opportunity to engage in athletic pursuits, including accessing relevant facilities, on the same terms, without subjecting any student to invasive bodily searches, while simultaneously maintaining single-user facilities for any student who does not wish to toilet or change in a communal space.

To craft and enforce a policy as tacitly implied by the Notice would require the District to engage in invasive inquiry into students' privacy, and to do so in a manner that would inequitably impact transgender students in a manner dissimilar to that of their cisgender peers, absent a sufficient justification, and raise significant concerns under the Equal Protection clause, *see e.g., Village of Willbrook v. Olech*, 582 U.S. 562, 564 (2000), as well as Title IX.

Jeffco is obliged to comply with these Federal laws.

**The Policy complies with state law.**

Colorado law requires that Jeffco provide access to **all** students facilities consistent with their gender identity. Since June 18, 2013, when the Colorado Civil Rights Division issued its decision in favor of Coy Mathis in Charge No. P20130034X, primary and secondary school students in the State of Colorado have enjoyed access to facilities aligned with their gender identity. In that matter, the Department of Regulatory Agencies determined that a public school discriminated against a six-year-old transgender girl in violation of state law when it denied her the opportunity to use the girls' restroom in alignment with her female gender identity. Consistent with that conclusion, the Colorado Legislature recognized that, "[t]he lack of accessibility to restroom facilities that are consistent with an individual's gender identity singles out those individuals and can result in experiences of harassment and cause those individuals to avoid restrooms entirely, which can lead to potentially serious physical injury or illness." Section 9-5.7-101(1)(b), C.R.S.

Today, Colorado law expressly requires equitable access to public accommodations–such as restroom and locker rooms– "free from discrimination," including discrimination based on the individual's gender identity and gender expression. *See* Section 24-34-300.7, - 301(9), C.R.S. The Colorado Civil Rights Commission sets forth in its Rules that places of public accommodation, including school entities such as the District must "allow individuals the use of gender-segregated facilitates that are consistent with their gender identity" including "restrooms, locker rooms, dressing rooms, and dormitories." 3 CCR 708-1, Rule 81.9 (B-C).

Jeffco's Policy providing that all students may access facilities congruent with their gender identity therefore necessarily complies with State of Colorado law, and students access restroom and locker rooms throughout Jeffco's 145 schools without an adult policing their presence or conducting checks of their external genitalia.

Several other states have adopted similar laws or policies that allow students to use facilities based on their gender identity. *See* Cal. Educ. Code § 221.5(f); *and see Doe v. Reg'l*

---

clothes bodies … includ[ing] urinal dividers, toilet stalls, and shower curtains – are sufficient to protect privacy interests.").

*Sch. Unit 26,* 86 A.3d 600 (Me. 2014) (Transgender female student prevailed on a claim that her rights were violated under state law when she was prohibited from accessing restroom facilities aligned with her gender identity); *Parents for Privacy v. Dallas Sch. Dist. No. 2*, 326 F.Supp. 3d 1075, 1108 (D. Or. July 24, 2018) (Dismissing a challenge to Oregon's anti-discrimination law, since "[a] policy that segregates school facilities based on biological sex and prevents transgender students from accessing facilities that align with their gender identity violates").

Jeffco is obliged to comply with binding Colorado law.

**The Policy complies with CHSAA Bylaws.**

Jeffco is a member of and offers every sport sanctioned by the Colorado High School Activities Association (CHSAA), which has been the governing body of high school athletics in the State of Colorado since 1921. Consistent with CHSAA's mission and values, Jeffco interprets participation in sport as a privilege that extends students' education. CHSAA's core values explicitly state that participation in athletics "promotes respect for diverse cultures, creeds, socio-economic status, racial and ethnic backgrounds, gender identity, and geographic locations." Its equity code requires that members schools afford equal access and opportunity "without unlawful discrimination based on disability, race, creed, color, gender identity, sexual orientation, religion, age, national origin, or ancestry." CHSAA Bylaws (2025-26), Article 3.2. CHSAA's Bylaws expressly "recognize[] the right of transgender student-athletes to participate in interscholastic activities free from unlawful discrimination based on sexual orientation and gender identification." *Id*. at Article 3.3.

If Jeffco wishes to continue offering interscholastic sports, it must comply with CHSAA policy. Forcing Jeffco to align its policies with the principles articulated in the Notice puts Jeffco in the untenable position of refusing to comply with a federal agency's order or excluding a subset of its students from sports and facilities based on their sex which could inhibit Jeffco's schools and teams from participating in interscholastic sports. The purpose of Title IX was to require an equal playing field for all students regardless of sex, not to close the field to everyone.

5. A written explanation of the guidance the District relied on or referenced in adopting and enforcing the policy described in paragraph 3.

Objection. This request is duplicative of the request in Paragraph 4, above. Without waiver of the foregoing objection, the response in Paragraph 4 is incorporated by refence herein.

6. Names and contact information for all District interscholastic team coaches, assistant coaches, trainers, athletic director(s), and assistant athletic director(s).

Attached at Bates No. 000369-000379.

7. A copy of the District's policy permitting the participation of biologically male students on girls' interscholastic athletic teams.

The District has no independent formal, written policy. As set forth in JB-R2, with regard to interscholastic activities, the District follows the CHSAA Transgender Policy Statement, available here: CHSAA Transgender Policy Statement."

8.  A copy of the District's athletic team rosters for all interscholastic sports teams designed or classified as teams for girls, identifying on each roster any participants who are biologically male.

Objection. This request seeks information including potential PI and PII regarding students that may also be subject to FERPA. In addition, District policy recognizes that the "right to privacy … includes the right to keep one's transgender status private school." JB-R2, Equal Education Opportunities – Transgender Students.

Without waiver of the foregoing objection, the District does not track the information sought regarding the sex of "any participants who are biologically male." A copy of rosters for District athletic teams, including the gender provided by students and/or their families, is attached at Bates No. 000074-000368.

9.  All documentation regarding any instance of which the District is aware when the policies permitting biologically male athletes to participate of (sic) girls' interscholastic athletic teams adverse affected female athlete(s), including but not limited to, by causing:
    a.  Injury;
    b.  Forfeiture of a competition; or
    c.  Denial of an opportunity to
        i.   Participate on the team;
        ii.  Advance to a higher-level competition or stage of competition;
        iii. Win a competition or championship;
        iv.  Place higher in a competition;
        v.   Receive a medal, award, or other recognition; or
        vi.  Obtain greater visibility to colleges.

Objection. This request for information is overly broad and unduly burdensome as the District does not track the information sought regarding instances of "policies permitting biologically male athletes … adverse[ly] affect[ing] female athletes."

Without waiver of the foregoing objection, the District is not aware of and has not been able to locate any responsive documents to this request through its reasonable efforts. Many school-level personnel are on academic year contracts, and will return to employment in August, at which time Jeffco can conduct additional outreach to reconfirm that no responsive documentation exists.

10. A copy of any written communication provided to District students, parents, employees, or the public, regarding whether students may use the restroom and/or locker room of their choice regardless of their sex.

The District's Policy (JB-R2, Equal Education Opportunities – Transgender Students) is publicly available HERE. All families affirm their familiarity with District policies as part of their enrollment process.

11. A copy of all written complaints received by the District and a copy of any records made of oral complaints received by the District from any student, parent, district staff, or anyone else regarding the District's policy or practice of allowing students to use locker rooms, restrooms, or changing facilities, and/or share accommodations with other

9

students based on "gender identity," and a copy of the investigative file with findings of an explanation of why an investigation was not conducted.

Jeffco is involved in a lawsuit regarding overnight accommodations under Policy JB-R2. The federal district court denied plaintiffs' request for a preliminary injunction in that case, finding they did not have standing. D. Colo. Case No. 24-2439, ECF No. 33, at p. 18 (holding "the Court denies the Motion for lack of standing.").

While the District has received some feedback from community members regarding Policy JB-R2, it is not aware of any formal complaint, grievance, or investigation, beyond the litigation described above.

A copy of the publicly available Complaint in the pending litigation is attached at Bates No. 000001-000053.

**12.** Any other information you believe will be helpful to OCR in resolving this investigation.

Jeffco has responded with information that it believes is sufficient to close this investigation. But if OCR needs additional information to close this investigation, please let us know what information may be helpful and we will investigate to determine whether such information is available.

10