# EXHIBIT C



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE FOR CIVIL RIGHTS**

March 13, 2025

By email only to: tracy.dorland@jeffco.k12.co.us

Tracy Dorland
Superintendent
Jefferson County Public Schools
1829 Denver West Drive #27
Golden, Colorado 80401

Re:  Case No. 08-25-5902 – Jefferson County Public Schools (CO)

Dear Superintendent Dorland:

The U.S. Department of Education, Office for Civil Rights (OCR), has completed its investigation of Jefferson County Public Schools (the District). The investigation examined whether the District discriminates against female students by permitting male students to access bathrooms[1] and locker rooms designated for use by female students, by denying equal athletic benefits and opportunities to female student athletes by permitting males to participate in girls' interscholastic athletics, thereby depriving girls and young women of equal athletic opportunities, and by forcing female students to share overnight accommodations with male students during overnight activity and athletic trips.

OCR enforces Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 *et seq.*, and its implementing regulation at 34 C.F.R. Part 106,[2] which prohibit discrimination on the basis of sex in any program or activity receiving federal financial assistance. As a recipient of federal financial assistance from the Department of Education, the District must comply with this law and its implementing regulations.

In accordance with OCR's Case Processing Manual (February 19, 2025), OCR has reached its determination by using a preponderance-of-the-evidence standard, and finds that the evidence supports a conclusion of noncompliance with Title IX. As further explained below, Title IX's prohibition of discrimination on the basis of sex does not include "gender identity" or "gender-identity discrimination."  "Sex," as used by the statute, does not mean, and has never meant, "gender identity." Title IX and its implementing regulations have never used or defined the term "gender identity." When recipients of federal funding treat males who identify as females as if they are biological females, they defeat the very purpose of Title IX: to ensure equal

---

[1] The terms "bathrooms" and "restrooms" are used interchangeably throughout this letter.

[2] This matter cites to the Title IX regulations that are currently in force and that took effect August 14, 2020 (85 Fed. Reg. 30,026-30,579 (May 19, 2020). *See Tennessee v. Cardona*, 762 F. Supp. 3d 615, 626-28 (E.D. Ky. 2025).

*Page 2 Letter of Findings – OCR case no. 08255902*

opportunities for women and girls. Allowing males to compete in female sports is demeaning, unfair, dangerous to girls, and denies girls the same equal opportunity to participate and excel in competitive sports afforded to boys. And allowing males to invade intimate female-only facilities and spaces like locker rooms, bathrooms, or overnight accommodations endangers girls' safety, privacy, and dignity, while denying them equal access to educational activities or programs. The District allows males to participate in female sports, use female locker rooms and bathrooms, and share overnight accommodations with female students. The District has done so despite displacing girls from athletic programs designed for and dedicated to female students. And it has done so despite complaints from families about privacy and safety harms resulting from the overnight accommodation policy—harms that are the obvious result of such policies. Thus, the District is in clear violation of Title IX.

## I.    Factual Background

The District, located in Jefferson County, Colorado, is the state's second-largest school district, serving approximately 75,000 students across 145 schools. For the 2024-25 school year, published student membership data indicate that the District's student population is approximately 48.9% female, 51.1% male, and 0.01% non-binary.

In the letter initiating this investigation, OCR identified District Policy JB-R2, "Equal Education Opportunities – Transgender Students," which incorporates by reference the "Transgender Policy Statement" promulgated by the Colorado High School Activities Association (CHSAA), the governing body of high school athletics in Colorado. The OCR letter noted, and this investigation confirms, that the policy is in irresolvable conflict with Title IX.

### A. Policies governing access to bathrooms, locker rooms, overnight accommodations, and interscholastic athletics

The District acknowledges that District Policy JB-R2 remains in effect. The policy states in relevant part:

*Privacy/Confidentiality*

All persons, including students, have a right to privacy and this includes the right to keep one's transgender status private at school.

School personnel should not disclose information that may reveal a student's transgender or gender nonconforming status to others, including school personnel and other community members, unless legally permitted to do so or unless the student has authorized such disclosure. In situations where the student has a desire to compete for their school in CHSAA-sanctioned activities, the school administration will work with the family to identify what information would need to be shared prior to submitting such information.

Transgender and gender nonconforming students have the right to discuss and express their gender identity and expression openly and to decide when, with

*(Continued on next page)*

*Page 3 Letter of Findings – OCR case no. 08255902*

(*Continued from previous page*)

whom, and how much to share private information. The fact that a student chooses to disclose his or her transgender status to staff or other students does not authorize school staff to disclose other private information about the student.

*Official Records*

The district shall maintain a mandatory permanent student record that includes a student's legal name and legal gender. However, to the extent that the district is not legally required to use a student's legal name and gender on a particular record or document, the district shall use the chosen name and preferred gender reflected in Infinite Campus. The district will change a student's official record to reflect a change in legal name or gender upon receipt of documentation that such change has been made pursuant to a court order, or through amendment of state or federally issued identification. In situations where school staff or administrators are required by law to use or report transgender student's legal name or gender, such as during standardized testing, school staff and administrators shall adopt practices to avoid the inadvertent disclosure of such confidential information.

. . . .

*Restroom Accessibility*

Students shall have access to the restroom that corresponds to their gender identity consistently asserted at school. Any student who has a need or desire for increased privacy, regardless of the underlying reason, should be provided access to a single stall restroom, but no student shall be required to use such a restroom.

*Locker Room Accessibility*

The use of locker rooms by students who are transgender and gender nonconforming shall be assessed on a case-by-case basis with the goals of maximizing the student's social integration and equal opportunity to participate in physical education classes and sports, ensuring the student's safety and comfort, and minimizing stigmatization of the student. In most cases, students who are transgender should have access to the locker room that corresponds to their gender identity consistently asserted at school.

Any student who has a need or desire for increased privacy, regardless of the underlying reason, should be provided with a reasonable alternative changing area such as the use of a private area (e.g., a nearby restroom stall with a door, an area separated by a curtain, a P.E. instructor's office in the locker room, or a nearby health office restroom), or with a separate changing schedule (e.g., using the locker room that corresponds to their gender identity before or after other students). Any alternative arrangement should be provided in a way that allows the student's

(*Continued on next page*)

*Page 4 Letter of Findings – OCR case no. 08255902*

(*Continued from previous page*)

transgender status to be kept confidential. In no case shall a student who is transgender be required to use a locker room that conflicts with the student's gender identity consistently asserted at school.

*Physical Education and Intramural and Interscholastic Athletics*

Students should be permitted to participate in physical education classes and intramural sports in a manner consistent with their gender identity. With regard to interscholastic activities, the district will follow the CHSAA Transgender Policy Statement, available here: https://chsaanow.com/documents/2021/7/28/TRANSGENDER_POLICY_STATEMENT_2019.pdf?id=420 https://chsaanow.com/sports/2021/7/19/bylaws.aspx

*Overnight Activity and Athletic Trips*

In the planning of sleeping arrangements during overnight activity and athletic trips, the needs of students who are transgender shall be assessed on a case-by-case basis with the goals of maximizing the student's social integration, providing equal opportunity to participate in overnight activity and athletic trips, ensuring the student's safety and comfort, and minimizing stigmatization of the student. In most cases, students who are transgender should be assigned to share overnight accommodations with other students that share the student's gender identity consistently asserted at school. Any alternative arrangement should be provided in a way that allows the student's transgender status to be kept confidential.  Under no circumstance shall a student who is transgender be required to share a room with students whose gender identity conflicts with their own.

As part of OCR's investigation, OCR requested copies of the District's policies describing the definition or meaning of the words "sex," "gender," and/or "gender identity." Neither "sex" nor "gender" are separately defined in District policy; however, the District identified District Policy AC, "Nondiscrimination and Equal Opportunity," which contains the following definitions:

"Gender Expression" means an individual's way of reflecting and expressing the individual's gender to the outside world, typically demonstrated through appearance, dress, and behavior.

"Gender Identity" means an individual's innate sense of the individual's own gender, which may or may not correspond with the individual's sex assigned at birth.

OCR also requested copies of relevant district policies regarding student use of restrooms, changing rooms, locker rooms, overnight accommodations, and participation of biologically male students on girls' interscholastic athletic teams. In response, the District identified the

(*Continued on next page*)

*Page 5 Letter of Findings – OCR case no. 08255902*

(*Continued from previous page*)

aforementioned, District Policy JB-R2, "Equal Education Opportunities – Transgender Students," as well as a copy of an informal guidance document for District staff titled "Supporting Transgender & Gender Nonconforming Students."

The guidance document describes itself as a compilation of resources and best practices that provide guidance in support of transgender and gender nonconforming students. It provides similar definitions of "Gender Expression" and "Gender Identity" to those contained in District Policy AC, as well as additional definitions related to gender:

GENDER EXPRESSION:
The manner in which a person represents or expresses gender to others, often through external appearance, characteristics, or behaviors.

GENDER FLUID:
A gender identity which refers to a gender which varies over time. A gender fluid person may at any time identify as male, female, transgender, non-binary, neutrois, any other non-binary identity, or some combination of identities. Their gender can also vary at random or in response to different circumstances. Gender fluid people may also identify as multigender, non-binary and/or transgender. Gender fluid people may feel more comfortable using gender neutral pronouns and have an androgynous gender expression.

GENDER IDENTITY:
A person's innate sense of their own gender, which can include being female, male, or non-binary. One's gender identity can be the same or different from their sex assigned at birth. The responsibility for determining an individual's gender identity rests with the individual. Children typically begin to understand their own gender identity by age four, although the age at which individuals come to understand and express their gender identity may vary based on each person's social and familial development.

GENDER NONCONFORMING:
A term for people whose gender expression differs from stereotypical expectations, such as "feminine" boys, "masculine" girls, and those who are perceived as androgynous. This includes people who identify outside traditional gender categories or identify as multiple genders. Other terms that can have similar meanings include gender diverse or gender expansive.

NON-BINARY:
Preferred umbrella term for all genders other than female/male or woman/man. Non-binary people may have a gender identity that is neither wholly male or female, is in-between, or is beyond gender. Non-binary individuals may identify as agender (without gender), gender-fluid (gender varying over time or based on the

(*Continued on next page*)

*Page 6 Letter of Findings – OCR case no. 08255902*

(*Continued from previous page*)

circumstances), or pangender (experiencing a variety of masculine, feminine, or androgynous identities).

. . .

SEX ASSIGNED AT BIRTH:
The sex (male or female) given to a child at birth, most often based on the child's external anatomy.

. . .

TRANSGENDER:
An adjective describing a person whose gender identity does not correspond with their sex assigned at birth.

TRANSITION:
The process in which a person goes from identifying as one gender to identifying as another. Transition is a process that is different for everyone, and it may or may not involve social, legal, or physical changes. There is no one step or set of steps that an individual must undergo in order to have their gender identity affirmed and respected.

**What Does "Consistently Identifies as" Mean in Regard to Gender?**
The analysis should always be thoughtful and objective. How has the student self-identified and presented over a period of time?
● Has the student or family asked for a name change or gender support plan?
● Has the family arranged for a change in preferred gender in Infinite Campus?
● What pronouns does the student prefer?
● How does the student dress?
● How does the student style their hair?
● How does the student move among classmates?
● How does the student speak with classmates?
● What bathroom does the student use?

The guidance document also contains a template for a "Confidential Gender Support Plan." The purpose of the plan is not explained in the document. The template includes the following prompts: "Which Name Student Uses," "Student's Gender Identity," "Pronouns Student Uses," "Legal Name," and "Assigned Sex at Birth."

Finally, the guidance document contains a section titled "Preferred Identity Change Request: Infinite Campus," and it includes technical instructions for the corresponding form. The section begins with the following statement:

Jeffco will abide by state and federal requirements by utilizing legal name and gender for federal and state reporting and when generating legal documents, including high school transcripts and immunization records; however, a student's

*Page 7 Letter of Findings – OCR case no. 08255902*

choice to express their preferred identity will be honored by Jeffco Public Schools with the appropriate documentation.

**B. Development and Adoption of District policies**

In the District's response to OCR, it explained that, in adopting and enforcing the policies described above, the District relied on federal and State of Colorado law, as well as the CHSAA Bylaws. Concerning federal law, the District asserts that, "although *Bostock v. Clayton County, Georgia*, 590 U.S. 644 (2019) considered a Title VII discrimination claim, its reasoning also supports Jeffco's decision to treat all students equally, regardless of their sex assigned at birth, when it comes to athletic opportunities and facilities access. Treating transgender female students differently as it regards access to opportunities and facilities would be tantamount to discrimination based on their sex." The District also references various other federal cases, none binding in Colorado. The District's misapplication of *Bostock* and the other cases is discussed in the legal standards and analysis sections of this letter.

The District also explained that, in developing its policies, it relied on rules and regulations from the Colorado Civil Rights Commission, 3 CCR 708-1. The purpose of the rules and regulations is to implement Parts 3 through 7 of Article 34 of Title 24, Colorado Revised Statutes (C.R.S.). Specifically, the District identifies Rule 81.9, which states:

Rule 81.9 – Gender-Segregated Facilities.

(A) Nothing in the Act prohibits segregation of facilities on the basis of gender.

(B) All covered entities shall allow individuals the use of gender-segregated facilities that are consistent with their gender identity. Gender-segregated facilities include, but are not limited to, restrooms, locker rooms, dressing rooms, and dormitories.

(C) In gender-segregated facilities where undressing in the presence of others occurs, covered entities shall make reasonable accommodations to allow access consistent with an individual's gender identity.

Regarding a policy permitting the participation of biologically male students on girls' interscholastic athletic teams, the District indicated that it "has no independent formal, written policy. As set forth in JB-R2, with regard to interscholastic activities, the District follows the CHSAA Transgender Policy Statement." The District provided OCR a link to a document that sets forth the following:

**CHSAA Transgender Inclusion Bylaw & Policy**
**Bylaw 300.           EQUITY CODE**

1. The Colorado High School Activities Association is committed to ensuring that all students have equal access and opportunities to participate in CHSAA sponsored

(*Continued on next page*)

*Page 8 Letter of Findings – OCR case no. 08255902*

(*Continued from previous page*)

activities and athletics.

2. Member schools shall ensure that all students have equal access and opportunities to participate in activities and athletics without unlawful discrimination based on disability, race, creed, color, gender, sexual orientation, religion, age, national origin, or ancestry.

3. The Colorado High School Activities Association recognizes the right of transgender student athletes to participate in interscholastic activities free from unlawful discrimination based on sexual orientation. In order to insure [sic] appropriate gender assignment for purposes of athletic eligibility, a transgender student-athlete's home school will perform a confidential evaluation to determine the gender assignment for the prospective student-athlete. The CHSAA will review athletic eligibility decisions based on gender assignment of transgender student-athletes in accordance with its approved policies and appeals procedures.

**CHSAA INCLUSION POLICY & OCR DEAR COLLEAGUE LETTER ON TRANSGENDER STUDENTS**

The Colorado High School Activities Association (CHSAA) Board of Directors approved this policy and process to address the eligibility of transgender/transitioned/student-participants in CHSAA sanctioned activities/athletics.

For the purposes of this policy, the following definitions will apply:

1. The term "sexual orientation" means a person's orientation toward heterosexuality, homosexuality, bisexuality, transgender status or another person's perception thereof.
2. The term "gender identity" means an individual's internal sense of gender.
3. The term "sex assigned at birth" refers to the sex designation recorded on an infant's birth certificate should such a record be provided at birth.
4. The term "transgender" describes those whose gender identity is different from the sex they were assigned at birth.
5. The term "gender expression" means external appearance, characteristics or behaviors typically associated with a specific gender.
6. The term "gender fluid" means denoting or relating to a person who does not identify themselves as having a fixed gender.
7. The term "detransition" means the cessation or reversal of a transgender identification or gender transition, whether by social, legal or medical means.
8. The term "covered entity" means any person, business, or institution required to comply with the antidiscrimination provisions of the law.

(*Continued on next page*)

*Page 9 Letter of Findings – OCR case no. 08255902*

(*Continued from previous page*)

9. Unlawful harassment includes severe or pervasive conduct that creates an environment that is subjectively and objectively hostile, intimidating, or offensive on the basis of gender identity, gender expression, or sexual orientation. Prohibited conduct includes, but is not limited to, the following:
   a. Asking unwelcome personal questions about an individual's gender identity;
   b. Intentionally causing distress to an individual by disclosing to others the individual's sexual orientation or transgender status;
   c. Using offensive names or terminology regarding an individual's gender identity, gender expression, or sexual orientation; or
   d. Deliberately misusing an individual's preferred name, form of address, or gender-related pronoun.

**<u>Policy Privacy</u>**:
All discussions and documentation in each level of the process either by a member school and/or CHSAA shall be kept confidential unless the student and family make a specific request.

**<u>Procedures</u>**:
The student's member school will be the first point of contact for determining the student's eligibility to participate in CHSAA sanctioned event(s). The student and parent(s)/guardian must notify the school in writing that the student has a consistent gender identity different than the student's gender assigned at birth and list the sanctioned event(s) in which the student would like to participate. The consistent gender identity as stated in the school letter will be the gender recognized for the entirety of the student's participation in CHSAA athletics/activities. (See Detransition Policy) A transgender student shall participate in accordance with their gender identity, and CHSAA Bylaw 2850.3 shall still apply.

The school may use the following criteria to determine participation:
- Current transcript and school registration information
- A written statement from the student affirming their gender identity.

The school may consider but may not require the following information, if it is voluntarily provided by the student or their parent/guardian:
- Documentation from individuals such as, but not limited to, parents, friends, and/or teacher, which affirm that the actions, attitudes, dress and manner demonstrate the student's gender identity.
- Written verification from an appropriate health-care professional (doctor, psychiatrist, psychologist) of the student's gender identity.
- Medical documentation (hormonal therapy, sexual re-assignment surgery, counseling, medical personnel, etc.)

(*Continued on next page*)

*Page 10 Letter of Findings – OCR case no. 08255902*

(*Continued from previous page*)

**Gender Fluid**:
Students that want to participate in CHSAA athletics and activities, must select one gender to participate. The process for gender identification and notification to the school is the same as stated above. Any subsequent detransition by a gender fluid student must also follow the detransition policy as stated below.

**Detransition Policy**:
Students that detransition after competing in their consistent gender identity at the high school level, must notify the school in writing of their intent to detransition and apply via written request to the school for further eligibility. The decision to approve the request will be made at the local level.

**Areas of Awareness for Schools**:
- Have a plan in place and be proactive.
- Use correct names/pronouns according to the student's self-identification, and permit the student to dress according to gender identity and or expression.
- Allow restroom and locker room access consistent to gender identity.
- Educate teachers, counselors, coaches, administrators, parents and students on transgender inclusion and awareness.[3]

## C.  Recent litigation against CHSAA, the Colorado Attorney General and the Colorado Civil Rights Division

On May 9, 2025, School District 49, a school district that serves more than 10,000 students in El Paso County, Colorado, filed a complaint in US District Court for the District of Colorado against CHSAA, the Colorado Attorney General, and the Colorado Civil Rights Division. Additional Districts in Colorado subsequently joined School District 49's complaint. The complaint sought declaratory and injunctive relief as follows:

[School District 49] brings this action to protect students' constitutional rights to equal protection and bodily privacy. The District has adopted policies classifying sports teams by biological sex and maintaining separate locker rooms and accommodations, protecting 1,695 student athletes (683 girls and 1,012 boys) across 14 sports programs in the District.

These policies are necessary to: (1) prevent sex discrimination by ensuring fair athletic competition for female students; (2) protect all students' Fourteenth Amendment privacy rights by maintaining separate changing facilities; and (3)

---

[3] The document the District provided is not the most recent version of the document available on the CHSAA website, which contains a document labeled as the August 2024 version and does not mention an OCR dear colleague letter. The version the District provided remains on the CHSAA website; however, the webpage has no internal links, i.e., an orphan page. Additionally, OCR could not locate the policy set forth in the document in the 2025-26 version of the bylaws published on the CHSAA website.

*Page 11 Letter of Findings – OCR case no. 08255902*

shield the District from liability under federal equal protection principles and Title IX.

Yet the Colorado Anti-Discrimination Act (CADA) and Colorado High School Activities Association (CHSAA) bylaws place the District in an untenable position by prohibiting its policies. Compliance with these state requirements would force the District to violate students' constitutional rights and risk federal funding loss, while adherence to federal obligations exposes the District to state penalties including fines and athletic-program suspension.

The District seeks a declaratory judgment that CADA and CHSAA bylaws are unconstitutional insofar as they prohibit classification of sports teams by sex, and an injunction against their enforcement.

On December 5, 2025, School District 49 announced on its website that it reached a settlement with CHSAA "that affirms the district's ability to protect fairness, safety, and privacy for student-athletes."[4] The announcement further states:

The agreement allows D49 to maintain biological sex-based policies for sports, locker rooms, and overnight accommodations while continuing to participate fully in CHSAA-sanctioned activities. The district views this outcome as an important step in restoring local control and upholding federal protections for all athletes.

What This Decision Means:

This agreement means D49 and all school districts involved in the lawsuit can now:

- Maintain separate sports teams for biological boys and girls.
- Keep locker rooms and overnight travel accommodations separated by biological sex.
- Avoid CHSAA-imposed penalties for upholding these policies.
- Comply with Title IX and the U.S. Constitution while rejecting mandates that put student privacy at risk.

"CHSAA deserves credit for doing the right thing," said Peter Hilts, D49 Superintendent. "By reaching this agreement, they've recognized the need to protect fairness in competition and privacy in school facilities for our female athletes. We appreciate their willingness to engage in thoughtful dialogue and reach a resolution that puts students first. This settlement is a major step forward, but our work isn't done. We will continue litigation against the Colorado Civil Rights Commission and the Attorney General's Office to ensure every district in Colorado has the freedom to protect girls' sports, safeguard student privacy, and uphold the

---

[4]    https://www.d49.org/p/~board/2025-2026-news-in-district/post/school-district-49-reaches-settlement-with-chssa-on-fairness-in-sports-lawsuit#:~:text=School%20District%2049%20has%20reached%20a%20settlement,biological%20sex%2Dbased%20policies%20for%20sports%2C%20locker%20rooms

*Page 12 Letter of Findings – OCR case no. 08255902*

spirit of Title IX. I encourage school boards across the state to follow our lead and adopt similar policies that ensure equal opportunity and safety for all students."

The CHSAA settlement is the first significant development in the broader legal case and underscores the district's commitment to student safety and equal opportunity.

D49 will continue its litigation against other named parties in the lawsuit, including the Colorado Civil Rights Division and the Colorado Attorney General.

## D.  Athletic Programs at the District

The District is a member of CHSAA and offers every CHSAA sanctioned sport. As part of the investigation, OCR requested a copy of the District's athletic team rosters for all interscholastic sports teams designed or classified as teams for girls, identifying on each roster any participants who are biologically male. In response the District indicated that it "does not track the information sought regarding the sex of 'any participants who are biologically male.'" The District nonetheless provided OCR a copy of rosters for District athletic teams indicating "the gender provided by students and/or their families." The roster data reveal that the District provides 12,573 interscholastic roster positions for twenty-nine sport categories across eighteen high schools.

| Sport | Total | M* | F* | "Nonbinary" |
|---|---|---|---|---|
| Boys Basketball | 583 | 562 | 21 | |
| Boys Cross Country | 351 | 325 | 26 | |
| Boys Golf | 287 | 287 | 0 | |
| Boys Lacrosse | 508 | 504 | 4 | |
| Boys Soccer | 784 | 775 | 9 | |
| Boys Swimming | 223 | 209 | 14 | |
| Boys Tennis | 358 | 348 | 10 | |
| Boys Track | 892 | 892 | 0 | |
| Boys Volleyball | 140 | 131 | 9 | |
| Boys Wrestling | 496 | 469 | 27 | |
| Girls Basketball | 412 | 1 | 410 | |
| Girls Cross Country | 333 | 21 | 312 | |
| Girls Field Hockey | 12 | 0 | 12 | |
| Girls Golf | 204 | 0 | 204 | |
| Girls Lacrosse | 194 | 1 | 193 | |
| Girls Soccer | 675 | 11 | 664 | |
| Girls Swimming | 439 | 5 | 434 | |
| Girls Tennis | 559 | 15 | 544 | |
| Girls Track | 612 | 0 | 612 | |
| Girls Volleyball | 757 | 6 | 751 | |
| Girls Wrestling | 106 | 0 | 106 | |
| [Unspecified Girls Team] | | | | 1 |
| Baseball | 559 | 550 | 9 | |
| Cheerleader | 429 | 6 | 423 | |

*Page 13 Letter of Findings – OCR case no. 08255902*

| Flag Football | 333 | 0 | 333 | |
| --- | --- | --- | --- | --- |
| Football | 1467 | 1439 | 28 | |
| Gymnastics | 191 | 4 | 187 | |
| Ice Hockey | 143 | 140 | 3 | |
| Poms | 160 | 0 | 160 | |
| Softball | 365 | 0 | 365 | |
| | | | | |
| Total | 12572 | 6701 | 5870 | 1 |

\*    Data provided by the District is based on "the gender provided by students and/or their families."

By providing sex-separated interscholastic athletic programs, the District implicitly recognizes physical differences between boys and girls. The need for interscholastic athletic teams separated by sex is further evidenced by the different equipment authorized for use in CHSAA interscholastic athletic competitions for several sports. Some examples of differences in CHSAA sanctioned interscholastic athletic competitions include:

- Volleyball: boys play with a higher net. The net height for girls is 7 feet 4 1/8 inches, and the net height for boys is 7 feet 11 5/8 inches.

- Hurdles (300m): hurdles for boys are higher. The height for boys is 36 inches while the height for girls is 30 inches.

- Shot Put: the minimum boys' shot put weighs 12 lbs. and the girls' shot put weighs 8.8 lbs.

- Discus: the discus for boys weighs 3.5 lbs.; the discus for girls weighs 2.2 lbs.

- Basketball: boys play with a larger and heavier ball. The basketball used by boys has a 29.5-inch circumference; for girls, the ball circumference is 28.5 inches.

### E.  Complaints

OCR requested a copy of all complaints received by the District regarding the District's policy or practice of allowing students to use locker rooms, restrooms, or changing facilities, and/or share accommodations with other students based on "gender identity," and a copy of the investigative file with findings or an explanation of why an investigation was not conducted.

The District identified a lawsuit regarding overnight accommodations in federal district court. The District acknowledged what it characterized as "some feedback from community members regarding Policy JB-R2," but indicated that it is not aware of any formal complaint, grievance, or investigation, beyond the litigation described above.

The allegations raised in the litigation concern students from three families and detail events dating back to 2022:

- One family alleged that, when their eleven-year-old daughter attended a District-sponsored trip to Philadelphia and Washington, D.C., the student was in her room

*Page 14 Letter of Findings – OCR case no. 08255902*

getting ready for bed on the first night of the trip when she learned she was to share a bed with a boy who identified as a girl.

- Another family alleged that their 11-year-old boy was attending the District's sixth-grade camping trip, which is built into the sixth-grade science program, when he had a similar experience. The student was in the mountains, away from home for the first time, and with no form of communication, when he realized one of his high school counselors—one who had been "female-identifying" the week before—was not male but was a "male-identifying" girl. He soon found out that this counselor was not just sleeping and changing in the same cabin but was also tasked by the District to supervise the boys' showers, including his own.

- After hearing of these experiences, the parents of a third family became concerned about their own children. Their son was planning to attend the outdoor camping trip and their daughter planned to attend overnight athletic trips. The family alleged that the District would not provide assurance that it would accommodate their students' discomfort rooming with a student of the opposite sex.

## II.    Legal Standards

### a.  Statutory and Regulatory Background

Title IX states a general prohibition on sex discrimination in education programs or activities that receive federal funding: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).[5]

After that general ban on sex discrimination, Title IX lists various sex-based practices that the statute does not forbid. Recipients of federal funding, for example, may have traditionally sex-separated schools (*id.* § 1681(a)(5)), fraternities and sororities (*id.* § 1681(a)(6)), Boys and Girls State conferences (*id.* § 1681(a)(7)), and scholarships for "beauty" pageants (*id.* § 1681(a)(9)). Schools may also have father-daughter dances if they provide "reasonably comparable activities" for "the other sex." *Id.* § 1681(a)(8). And Title IX's ban on sex discrimination cannot be "construed" to prohibit "separate living facilities for the different sexes." *Id.* § 1686.

Title IX empowers and directs Federal departments and agencies to issue and enforce regulations to effectuate the provisions of Title IX. *See id.* § 1682. The Department has exercised this

---

[5] Title IX defines "educational institution" to include "any public or private preschool, elementary, or secondary school." 20 U.S.C. § 1681(c). Similarly, 34 C.F.R. § 106.2(k) defines "educational institution" to include a local educational agency (LEA) as defined by section 1001(f) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 3381), a preschool, a private elementary or secondary school. And Title IX defines "program or activity" to include: "a local educational agency . . . or other school system. . . ; an entire corporation, partnership, or other private organization . . . if assistance is extended to such corporation, partnership, private organization; or which is principally engaged in the business of providing education, . . . ; or any other entity which is established by two or more of the entities described [herein]; any part of which is extended Federal financial assistance . . . ." 20 U.S.C. § 1687; *see also* 34 C.F.R. § 106.2(h).

*Page 15 Letter of Findings – OCR case no. 08255902*

authority from the beginning, issuing regulations making clear that schools may have sex-separate bathrooms, athletic programs, among other things. See 40 Fed. Reg. 24,128, 24,141-43 (June 4, 1975). The general prohibition against sex discrimination appears at 34 C.F.R. § 106.31(a). Some specific applications appear at 34 C.F.R. § 106.31(b).

Regarding intimate facilities, the regulations require parity: "A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33.

As to athletics, the regulations first state a general prohibition against sex-segregation:

> (a) General. No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

34 C.F.R. § 106.41(a). The regulations then state two exceptions:

> (b) Separate teams. Notwithstanding the requirements of paragraph (a) of this section, a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is [1] based upon *competitive skill* or [2] the activity involved is a *contact sport*. However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport. For the purposes of this part, contact sports include boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact.

34 C.F.R. § 106.41(b) (emphasis added). Further, notwithstanding the general prohibition against sex-segregation or the two exceptions in which sex-segregation is permitted, the regulations require that members of both sexes be afforded equal athletic opportunity:

> (c) Equal Opportunity. A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes. In determining whether equal opportunities are available the Director will consider, among other factors:
>
> > (1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;
> >
> > (2) The provision of equipment and supplies;
> >
> > (3) Scheduling of games and practice time;
> >
> > (4) Travel and per diem allowance;

*Page 16 Letter of Findings – OCR case no. 08255902*

(5) Opportunity to receive coaching and academic tutoring;

(6) Assignment and compensation of coaches and tutors;

(7) Provision of locker rooms, practice and competitive facilities;

(8) Provision of medical and training facilities and services;

(9) Provision of housing and dining facilities and services;

(10) Publicity.

Unequal aggregate expenditures for members of each sex or unequal expenditures for male and female teams if a recipient operates or sponsors separate teams will not constitute noncompliance with this section, but the Assistant Secretary may consider the failure to provide necessary funds for teams for one sex in assessing equality of opportunity for members of each sex.

34 C.F.R. § 106.41.

### b. Title IX Prohibits Discrimination Based on "Sex," Not "Gender Identity"

Title IX states a general prohibition on "sex" discrimination in education programs or activities receiving federal funding: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a). The term "sex" is both objective and binary. As used in Title IX, it does not mean, and has never meant, "gender identity."

When Congress passed Title IX in 1972, contemporaneous dictionaries defined "sex" as biological sex. *See Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F. 4th 791, 812-13 (11th Cir. 2022) (en banc) (consulting nine contemporary dictionaries for definitions); *see id.* at 812-15 (finding Title IX refers to biological sex). What dictionaries establish, Title IX's context confirms. "Title IX and its implementing regulations include provisions that presuppose sex as a binary classification, and provisions in the Department's current [and longstanding] regulations . . . reflect this presupposition." *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026, 30,178 (May 19, 2020). Section 1681(a)(2), for example, distinguishes between "institution[s] which admi[t] only students of one sex" and "institution[s] which admi[t] students of *both sexes*." 20 U.S.C. §1681(a)(2) (emphasis added). Section 1681(a)(8) similarly refers to sex in binary terms: If father-son or mother-daughter activities are provided for "one sex," then "reasonably comparable activities" must be provided for "the other sex." *Id.* § 1681(a)(8). And Title IX's implementing regulation on bathrooms, like other regulations, use the term "sex" in binary and biological terms. *See*, *e.g.*, 34 C.F.R. § 106.33 (authorizing "separate toilet, locker room, and shower facilities on the basis of sex" and making clear that "such facilities provided for students of *one sex* shall be comparable to such facilities provided to students of *the other sex*") (emphasis added); 85 Fed. Reg. at 30,178 ("In promulgating regulations to implement Title IX, the Department expressly acknowledged physiological differences between the male and female sexes."). Thus, all indicators of ordinary meaning show that "sex" in Title IX means biological sex and is not influenced by subjective perceptions of one's own "gender." *See Alabama v. U.S.*

*Page 17 Letter of Findings – OCR case no. 08255902*

*Sec'y of Educ.*, No. 24-12444, 2024 WL 3981994, at \*4 (11th Cir. Aug. 22, 2024) ("the term 'sex' in Title IX 'unambiguously' referred to 'biological sex' and not 'gender identity'").

Consistent with "sex" meaning biological sex in Title IX, on January 20, 2025, and February 5, 2025, the President of the United States issued two Executive Orders that reaffirm the meaning of the term "sex" in Title IX:

> (a) "Sex" shall refer to an individual's immutable biological classification as either male or female. "Sex" is not a synonym for and does not include the concept of "gender identity."
>
> (b) "Women" or "woman" and "girls" or "girl" shall mean adult and juvenile human females, respectively.
>
> (c) "Men" or "man" and "boys" or "boy" shall mean adult and juvenile human males, respectively.
>
> (d) "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.
>
> (e) "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell.

Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8,615-16 (Jan. 30, 2025); *see also* Executive Order 14201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9,279 (Feb. 11, 2025) (incorporating Executive Order 14168's definitions). And following the Executive Order 14168, the U.S. Department of Health and Human Services published definitions of "sex" and related words (such as "female," "male," "girl," "woman," "boy," and "man"), stating that "sex" means "a person's immutable biological classification as either male or female."[6]

Title IX and its implementing regulations never use the term "gender identity," let alone define the term, reinforcing that Title IX prohibits sex discrimination, not "gender identity" discrimination. And that makes sense: "gender identity" is subjective. As the President has explained, "gender identity" "reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex." Executive Order 14168, 90 Fed. Reg. at 8,616. Indeed, as some courts have explained, "gender identity" is not a "'discrete'" category but "can describe 'a huge variety of gender identities and expressions.'" *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 487 (6th Cir.), *aff'd sub nom.*, 605 U.S. 495 (2025).[7] And according to a once blindly followed but now discredited organization,

---

[6] U.S. Dep't of Health and Human Services, Office on Women's Health, Sex-Based Definitions, https://womenshealth.gov/article/sex-based-definitions (Nov. 14, 2025).

[7] In a recent seminal decision, the Supreme Court rejected an equal-protection challenge to a State's child-protection law that prohibited providing controversial medical interventions to minors to address gender dysphoria. *United States v. Skrmetti*, 605 U.S. 495 (2025). The Court concluded that the challenged law was subject to rational-basis review because it did not classify based on sex or "transgender status." *Id.* at 510-15, 517-19. The law, the Court explained, easily passed the rational-basis standard because of the "medical and scientific uncertainty" surrounding interventions for "gender dysphoria." *Id.* at 522-25.

*Page 18 Letter of Findings – OCR case no. 08255902*

World Professional Association for Transgender Health (WPATH), someone can be "more than one gender identity simultaneously or at different times (*e.g.*, bigender)," "not have a gender identity or have a neutral gender identity (*e.g.*, agender or neutrois)," "have gender identities that encompass or blend elements of other genders (*e.g.*, polygender, demiboy, demigirl)," or "have a gender that changes over time (*e.g.*, genderfluid)." *Standards of Care for the Health of Transgender and Gender Diverse People*, World Prof. Ass'n Transgender Health, S80 (8th ed. 2022); *United States v. Skrmetti*, 605 U.S. 495, 544 (2025) (Thomas, J., concurring) ("WPATH appears to rest [its conclusions] on self-referencing consensus rather than evidence-based research."); *id.* at 547 (WPATH and other "prominent medical professionals . . . have built their medical determinations on concededly weak evidence" and "have surreptitiously compromised their medical recommendations to achieve political ends."). Even the ACLU contends that "transgender" means "a broad range of identities and experiences that fall outside of the traditional understanding of gender." *See* ACLU, *Transgender People and the Law*, at 19-20.[8]

Simply put, "gender identity" is not "ascertainable at the moment of birth." *L.W.*, 83 F.4th at 487; *Skrmetti*, 605 U.S. at 550-51 (Barrett, J., concurring) (explaining that someone's status as "transgender" is not "definitively ascertainable at the moment of birth," that "transgender status does not turn on an immutable characteristic," that "the transgender population [is not] a discrete group," and that the group's "boundaries . . . are not defined by an easily ascertainable characteristic that is fixed and consistent across the group" (cleaned up)); *id.* at 566 (Alito, J., concurring in part and in the judgment) ("Transgender status is not 'immutable,' and as a result, persons can and do move into and out of the class. Members of the class differ widely among themselves, and it is often difficult for others to determine whether a person is a member of the class."); *id.* at 576-77(similar). Or, as the Department of Health and Human Services has explained, "[i]t may be true that a person's gender identity is subjective[,] . . . but the more critical point is that no tolerably clear definition of 'gender identity' has been offered in the first place."[9] Quite sensibly, therefore, neither Title IX nor its implementing regulation address "gender identity."

In short, Title IX's bar on sex discrimination does not include discrimination on the basis of the subjective perception of one's own "gender." As many courts have rightly concluded, "the term 'sex' in Title IX 'unambiguously' refer[s] to 'biological sex' and not 'gender identity.'" *Alabama*, 2024 WL 3981994, at *4; *accord*, *e.g.*, *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880, at *2 (6th Cir. July 17, 2024); *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 814-15 (11th Cir. 2022) (en banc); *Kansas v. United States Dep't of Educ.*, 739 F. Supp. 3d 902, 920 (D. Kan. 2024); *Tennessee v. Cardona*, 737 F. Supp. 3d 510, 530-36 (E.D. Ky. 2024); *Louisiana v. U.S. Dep't of Educ.*, 737 F. Supp. 3d 377, 399-400 & nn.48-49 (W.D. La. 2024); *Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*, 741 F. Supp. 3d 515, 520-25 (N.D. Tex. 2024).

Contemporaneous post-enactment history confirms Title IX does not include discrimination based on "gender identity." Shortly after Title IX was enacted in 1972, Congress passed the Javits Amendment, which directed the Department of Education's predecessor to create regulations "implementing . . . [T]itle IX," which "shall include" regulations on "intercollegiate athletic activities." 88 Stat. 484, 612 (1974). The agency then issued regulations that allow sex

---

[8] https://www.aclu.org/sites/default/files/field_pdf_file/lgbttransbrochurelaw2015electronic.pdf.
[9] *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices*, U.S. Department of Health and Human Services, 34 (May 1, 2025), https:// opa.hhs.gov/gender-dysphoria-report.

*Page 19 Letter of Findings – OCR case no. 08255902*

separation in many contexts—including sports. 40 Fed. Reg. 24,128, 24,141-43 (June 4, 1975).[10] Those contemporaneous regulations, nearly all of which still exist today, are strong evidence of Title IX's original public meaning. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) ("[I]nterpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning."); *id.* at 370 ("Such respect was thought especially warranted when an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time.").[11] In fact, that evidence is even stronger here because Congress had the chance to disapprove of these regulations before they went into effect and chose not to. *See Grove City Coll. v. Bell*, 465 U.S. 555, 568 (1984); *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 530-35 (1982). Reading Title IX's bar on sex discrimination to wholesale include "gender-identity discrimination," as some wrongly claim, would eviscerate these contemporaneous regulatory interpretations of Title IX, including the regulation on athletics. That "highly counterintuitive result" cannot be right. *See Yellen v. Confederated Tribes of Chehalis Rsrv.*, 594 U.S. 338, 360 (2021).

Congress's actions for more than 50 years following Title IX's enactment further confirm that Title IX's bar on sex discrimination does not include "gender-identity discrimination." In other statutory contexts, Congress has acted affirmatively to address gender-identity discrimination as a distinct category separate from sex discrimination. For example, when Congress enacted the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act of 2009, Pub. L. No. 111-84, Div. E., 123 Stat. 2190 (2009), Congress found that the "incidence of violence motivated by the actual or perceived race, color, religion, national origin, *gender*, sexual orientation, *gender identity*, or disability of the victim poses a serious national problem." 34 U.S.C. § 30501(1) (emphases added). Similarly in 2013, Congress amended the Violence Against Women Act to create a federal government enforcement action that protected the separate bases of sex and gender identity. *See* 34 U.S.C. § 12291(b)(13)(A) (2013), as amended by Pub. L. No. 113-4, § 3, 127 Stat. 56 (2013) (prohibiting discrimination in certain federally funded programs "on the basis of actual or perceived race, color, religion, national origin, *sex, gender identity* (as defined in [18 U.S.C. § 249(c)(4)]), sexual orientation, or disability" (emphasis added)). These post-Title IX enactments show that Congress recognizes the difference between "sex" and "gender

---

[10] *E.g.*, 40 Fed. Reg. 24,137, 24,142-43 (July 4, 1975) (presently at 34 C.F.R. §106.41(b) ("a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport")); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.43 ("If use of a single standard of measuring skill or progress in physical education classes has an adverse effect on members of one sex, the recipient shall use appropriate standards that do not have that effect.")); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.32(b) (A recipient "may provide separate housing on the basis of sex" provided the housing provided "to students of one sex, when compared to that provided to students of the other sex, shall be" proportionate and comparable)); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.33 ("A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex.")).

[11] *See also* Revised Letter of Impending Enforcement Action, Connecticut Interscholastic Athletic Conference, *et al.*, Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007, at 34 (Aug. 31, 2020) (looking to contemporaneous actions to demonstrate that "Title IX was passed . . . to protect equal athletic opportunity for students who are biological females, including [in] sex-segregated athletics").

*Page 20 Letter of Findings – OCR case no. 08255902*

identity" and prohibits discrimination based on "gender identity" when it so intends; it did not do so in Title IX. *DHS v. MacLean*, 574 U.S. 383, 394 (2015).[12]

### c. Title IX's Exceptions for Sex-Segregated Intimate Facilities and in Athletics Are Rooted in Bona Fide Biological Distinctions Between the Two Sexes

As noted above, Title IX permits recipients to segregate students based on sex in intimate facilities, as long as the facilities "provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33. And regarding athletics, such sex-based segregation is permitted "where selection for such teams is [1] based upon *competitive skill* or [2] the activity involved is a *contact sport*." 34 C.F.R. § 106.41(b) (emphasis added). Both exceptions are based on actual and relevant biological distinctions between males and females.

### 1. Intimate Facilities

Making distinctions based on relevant biological differences between the sexes is not prohibited sex discrimination under Title IX. Title IX states a general prohibition on "sex" discrimination in education programs or activities receiving federal funding. 20 U.S.C. § 1681(a). Discrimination in Title IX, just as elsewhere, means treating individuals or groups that "are similarly situated differently without sufficient justification for the difference in treatment." *Alabama Dep't of Revenue v. CSX Transp., Inc.*, 575 U.S. 21, 26 (2015); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005). Thus, because the two sexes are usually similarly situated when it comes to educational programs, Title IX usually prohibits sex separation in academic programs. *See, e.g.*, 34 C.F.R. § 106.31(b), 106.34(a); *but see* 34 C.F.R. 106.34(b).

Critically, not *all* sex-based classifications are prohibited discrimination under Title IX. Acknowledging material biological differences between the sexes, Congress explicitly clarified that Title IX's general bar on sex discrimination must not "be *construed* to prohibit any" federal-funding recipient "from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686 (emphasis added).

In particular, when students are in a state of undress, the biological differences between the sexes are pronounced and paramount. It is for that reason that Title IX's implementing regulations have, since Title IX's enactment, permitted separation based on sex in intimate facilities, authorizing "separate toilet, locker room, and shower facilities on the basis of sex." 34 C.F.R. § 106.33. That regulation, which was reviewed by Congress before becoming effective, "accurately reflect[s] congressional intent" and reflects the statute's original public meaning. *Grove City*, 465 U.S. at 568; *Loper Bright*, 603 U.S. at 394.

---

[12] *Bostock v. Clayton County*, 590 U.S. 644 (2020), is not to the contrary. *Bostock*, a Title VI case, does not extend to Title IX, and certainly not to sex-segregated athletics and intimate facilities, which are both expressly authorized under Title IX. Further, even on its own reasoning, *Bostock* would not yield a result different than the one articulated here. Unlike in *Bostock*, males and females are not similarly situated when it comes to athletics and intimate facilities, given their pertinent and real biological differences. Thus, treating all males as males (and all females as females) for the purposes of sex-segregated athletics and intimate facilities, notwithstanding each student's subjective perceptions of their "gender," is not, and logically cannot be, prohibited by Title IX.

*Page 21 Letter of Findings – OCR case no. 08255902*

"In light of the privacy interests that arise from the physical differences between the sexes, it has been commonplace and universally accepted—across societies and throughout history—to separate on the basis of sex those public restrooms, locker rooms, and shower facilities that are designed to be used by multiple people at a time." *Grimm*, 972 F.3d at 634 (Niemeyer, J., dissenting). "[T]he privacy afforded by sex-separated bathrooms has been widely recognized throughout American history and jurisprudence. In fact, 'sex-separation in bathrooms dates back to ancient times, and, in the United States, preceded the nation's founding.'" *Adams*, 57 F.4th at 805.

Unsurprisingly, "courts have long found a privacy interest in shielding one's body from the opposite sex in a variety of legal contexts," which is why "[t]he protection of students' privacy interests in using the bathroom away from the opposite sex and in shielding their bodies from the opposite sex is obviously an important governmental objective." *Id.* at 804-05. Including the Supreme Court: The Court acknowledged that admitting women to the Virginia Military Institute for the first time "would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements." *United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996). Indeed, "as then-Professor Ruth Bader Ginsburg noted, 'separate places to disrobe, sleep, and perform personal bodily functions are permitted, *in some situations required*, by regard for individual privacy." *Adams*, 57 F.4th at 804 (emphasis in original) (alterations omitted) (quoting Ruth Bader Ginsburg, The Fear of the Equal Rights Amendment, Wash. Post, Apr. 7, 1975, at A21).

Title IX recognizes as much. It thus allows recipients to assign sex-segregated living facilities, bathrooms, locker rooms, and shower facilities. 20 U.S.C. § 1686; 34 C.F.R. §§ 106.32(b), 106.33. Those rules are grounded in students' privacy, safety, and dignitary interest in using intimate facilities away from students of the opposite sex and in shielding their bodies from students of the opposite sex while in intimate facilities. Conversely, permitting people of the opposite sex into such sex-segregated spaces undermines those privacy, safety, and dignitary interests. *See*, *e.g.*, Reem Alsalem, *Special Rapporteur on Violence Against Women and Girls, Its Causes and Consequences*, U.N. Doc. A/79/325 at 5/24 (August 27, 2024), https://docs.un.org/en/A/79/325 (indicating that policies denying female students sex-separated intimate facilities increases the risk of sexual harassment, assault, voyeurism, and physical and sexual attacks in unisex locker rooms and toilets).

Thus, segregating intimate facilities on the basis of each person's subjective perceptions of their own "gender" does not merely read words into the regulation that are not there. It affirmatively violates Title IX by imposing on women and girls the very harms that Title IX, and its implementing regulation 34 C.F.R. § 106.33, was intended to prevent. Title IX permits recipients to segregate intimate facilities based on sex. It *prohibits* them from segregating intimate facilities based on subjective "gender identity."

### 2.    Contact Sports

Title IX similarly permits recipients to operate sex-segregated athletics programs in sports "the purpose or major activity of which involves bodily contact." 34 C.F.R. § 106.41(b). There are two rationales for this exception. The first relates to student safety: Women tend to be lighter and smaller than men, thus putting women who are compelled to compete with men in contact sports

in a significantly greater risk of danger. (As we discuss further below, the pertinent differences between men and women turn on biology, not subjective perception of one's "gender.")

The second rationale for the contact sports exception is similar to the rationale for segregating intimate spaces. Contact sports, such as wrestling and rugby, compel competitors to be in regular close—sometimes intimate—physical contact. The regulations rightly recognize that compelling men and women to wrestle against each other, for example, would often involve unwanted physical contact that is exceptionally intrusive and may even be perceived to be sexual in nature. For younger students, natural curiosity about the differences between the sexes might cause students in exceptionally close physical contact with members of the opposite sex to explore the ways in which their competitor's body differs from their own. For older students, sexual attraction might motivate a student to engage a competitor in ways that he or she would not have but for that sexual attraction. And for the student being touched, the mere *perception* (even if it is not true) that he or she is being touched due to sexual curiosity or sexual attraction can be exceptionally uncomfortable, distracting, and possibly even traumatic. The need to protect personal privacy could not be greater than where it involves potential unwanted or inappropriate direct physical contact that is or is perceived to be sexual in nature.

The regulations therefore permit recipients to draw a bright line, segregating participation in contact sports on the basis of sex, even if that means that members of one sex are denied the opportunity to play that particular contact sport. *See* 34 C.F.R. § 106.41(b) (distinguishing the competitive skill and contact sport rationales on this point); *but see* 34 C.F.R. § 106.41(c) (demanding "equal athletic opportunity for members of both sexes").

To be sure, unwanted or inappropriate physical contact, including sexual contact, can and does occur between members of the same sex. But eliminating that from student athletics entirely would require a ban on all contact sports. The regulations, quite rightly, impose no such categorical prohibition. Instead, recognizing that the likelihood of unwanted or inappropriate touching is far greater when members of *different* sexes compete against each other in contact sports, the regulations permit recipients to keep contact sports limited to members of a single sex, who all share the same biological features.

### 3.      Competitive Skill

The regulations further permit recipients to segregate components of their athletics program on the basis of sex when "selection for such teams is based upon competitive skill." 34 C.F.R. § 106.41(b). The regulations thus acknowledge an obvious truth: men and women are different, not just in appearance but also in their physical abilities.

"It is beyond dispute that, barring rare genetic mutations not at issue here, a person either has male sex chromosomes or female sex chromosomes," and this biological trait "determines many of the physical characteristics relevant to athletic performance." *B.P.J. v. W. Virginia State Bd. of Educ.*, 98 F.4th 542, 567 (4th Cir. 2024) (Agee, J., dissenting in relevant part), *cert. granted*, No. 24-43, 2025 WL 1829164 (U.S. July 3, 2025). On average, males and females differ with respect to attributes like height, weight, bone structure, muscle mass, and heart and lung capacity. *See, e.g., id.* at 567-68; *Adams*, 57 F.4th at 819-20 (Lagoa, J., concurring) (discussing scientific literature regarding biological advantages of males over females in many sports). This results in males being stronger and faster than females, all else being equal—*i.e.*, if they have had similar

*Page 23 Letter of Findings – OCR case no. 08255902*

environmental experiences and possess similar genetic traits other than the different sex chromosome.

This biological fact has legal implications. For example, in *United States v. Virginia*, the Supreme Court found that admitting women to a previously all-male military academy "would undoubtedly require" that institution "to adjust aspects of the physical training programs." 518 U.S. 515, 550 n.19 (1996). Similarly, in *Bauer*, the Fourth Circuit recognized that "[m]en and women simply are not physiologically the same for the purposes of physical fitness programs." 812 F.3d at 350. "[T]o account for the[se] innate physiological differences," the FBI has adopted sex-normed physical-fitness standards for special agents: *e.g.*, men must do 30 push-ups and run 1.5 miles in 12 minutes and 24 seconds, whereas women need only do 14 push-ups and run 1.5 miles in 13 minutes and 59 seconds. *See id.* at 343-44; U.S. Fed. Bureau of Investigation, U.S. Dep't of Justice, Special Agent Physical Requirements, https://fbijobs.gov/special-agents/physical-requirements. The Fourth Circuit held that the adoption or implementation of such sex-based standards do not constitute discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a). *Bauer*, 812 F.3d at 351. Congress has likewise recognized that "physiological differences between male and female individuals" warrant sex-based differences in physical-fitness admissions standards at military academies. Pub. L. No. 94-106, Tit. VIII, § 803(a), Oct. 7, 1975, 89 Stat. 537-538 (10 U.S.C. § 7442 note).

So too with regard to Title IX: the regulations permit recipients to separate males and females in their athletics programs to the extent that doing so reflects a difference in the competitive skill of the sexes. 34 C.F.R. § 106.41(b).[13]

### c.   Equal Athletic Opportunity is Denied When Men Are Permitted to Play in Women's Sports

The regulations further require "[a] recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c). The regulations provide a list of factors that OCR considers when assessing the equality of opportunity, and direct OCR not to rest any decision on "[u]nequal aggregate expenditures for members of each sex." *Id.* This often yields a complex multi-factor analysis. Not so here.

As explained above, 34 C.F.R. § 106.41(a) prohibits discrimination on the basis of sex in athletics programs. 34 C.F.R. § 106.41(b) permits recipients to offer sex-segregated athletics in

---

[13] Though the sexes' divergence in athletic performance grows in adulthood, it rests on innate biological differences that exist at birth and manifest during childhood. Sex chromosomes give rise to "pre-puberty physical differences that affect athletic performance." *Adams*, 57 F.4th at 819 (Lagoa, J., specially concurring); *see B.P.J.*, 98 F.4th at 568 (Agee, J., dissenting in relevant part) ("there is evidence that biological boys have a competitive advantage over biological girls even before puberty"). The undeniable physiological differences between males and females provide boys and men with inherent advantages in strength, speed, and physicality that pre-determine the outcome of athletic contests. "Males and females are materially different with respect to the main physical attributes that contribute to athletic performance." Doriane Lambelet Coleman et. al., *Re-Affirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule*, 27 Duke J. Gender L. & Pol'y 69, 92 (2020) (citing *The Role of Testosterone in Athletic Performance*, Duke Ctr. for Sports Law & Policy (Jan. 2019)). https://law.duke.edu/sites/default/files/centers/sportslaw/Experts_T_Statement_2019.pdf.

*Page 24 Letter of Findings – OCR case no. 08255902*

certain specific contexts. Within those contexts, men are able to participate on male-only teams. Sections 106.41(b) (for non-contact sports) and 106.41(c) both generally require that women be afforded the opportunity to participate on corresponding female-only teams.

Recipients that permit men to compete on women's teams on the basis of their subjective perception of their "gender" thus presumptively violate § 106.41(c) and § 106.41(b) (for non-contact sports). Such recipients allow men to engage in fair and safe competition against other men while subjecting women to unfair and unsafe conditions, subjecting them to risk of injury, displacing them from podiums in athletic competitions, causing them to lose opportunities for advancement to regional and national competitions, and to miss out on critical visibility for future opportunities and recognition. That unequal treatment denies them "equal athletic opportunity" in violation of Title IX. 34 C.F.R. § 106.41(c); *see* Executive Order 14,201, 90 Fed. Reg. at 9279 ("In recent years, many educational institutions and athletic associations have allowed men to compete in women's sports. This is demeaning, unfair, and dangerous to women and girls, and denies women and girls the equal opportunity to participate and excel in competitive sports."); *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 294-95 (2d Cir. 2004) ("Treating girls differently regarding a matter so fundamental to the experience of sports—the chance to be champions—is inconsistent with Title IX's mandate of equal opportunity for both sexes.").

Title IX's purpose confirms as much. *See Abramski v. United States*, 573 U.S. 169, 179 (2014) ("[The Court] must (as usual) interpret the relevant words not in a vacuum, but with reference to the statutory context, structure, history, and purpose." (quotation marks omitted)). Title IX was manifestly passed to promote "girls' and women's rights." *Adams*, 57 F.4th at 817 (Lagoa, J., concurring); *see McCormick*, 370 F.3d at 286 ("Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities."). And Title IX has achieved substantial success in that regard, especially in the realm of sports. "[O]ne need not look further than the neighborhood park or local college campus to see the remarkable impact Title IX has had on girls and women in sports." *Adams*, 57 F.4th at 818 (Lagoa, J., concurring). "In 1971, before Congress enacted the statute, approximately 300,000 girls and 3.67 million boys played competitive high school sports nationwide." *McCormick*, 370 F.3d at 286. Today, Title IX "has had stellar results." *Louisiana*, 737 F. Supp. 3d at 390. By 1999, 2.6 million girls participated in interscholastic athletics. By 2011, that number was 3.25 million. *Id.*

Policies or practices that "comingl[e] both biological sexes in the realm of female athletics" have "vast societal consequences" and "threaten to undermine one of Title IX's major achievements, giving young women an equal opportunity to participate in sports." *Adams*, 57 F.4th at 818, 821 (Lagoa, J., concurring) (brackets omitted); *see Clark v. Arizona Interscholastic Ass'n* (*Clark II*), 886 F.2d 1191, 1193 (9th Cir. 1989) ("If males are permitted to displace females on the school volleyball team even to the extent of one player . . . , the goal of equal participation by females in interscholastic athletics is set back, not advanced."). This confirms that creating new extra-statutory privileges based on "gender identity" for otherwise sex-separate sports violates Title IX.[14]

---

[14] To explain the meaning of "equal athletic opportunity" and "effective accommodation" under 34 C.F.R. § 106.41(c), OCR issued a Policy Interpretation, entitled Title IX of the Education Amendments of 1972—A Policy Interpretation: Title IX and Intercollegiate Athletics, 44 Fed. Reg. 71,413 (1979) ("Policy

*Page 25 Letter of Findings – OCR case no. 08255902*

    **d.  Recipients Must Provide a Prompt and Equitable Resolution to Student and Employee Complaints of Sex Discrimination**

Title IX's regulations provide that "[a]ny person may report sex discrimination, including sexual harassment (whether or not the person reporting is the person alleged to be the victim of conduct that could constitute sex discrimination or sexual harassment)" and  require the recipient to "adopt and publish grievance procedures that provide for the prompt and equitable resolution of student and employee complaints alleging any action that would be prohibited by this part. . . ." 34 C.F.R. § 106.8. If OCR determines that a student or employee was discriminated against on the basis of sex, the recipient is responsible to determine what occurred and to respond appropriately. OCR evaluates the appropriateness of the responsive action by assessing, among other matters, whether the response was prompt and equitable. *See* 34 C.F.R. §§ 106.8(b)(2); 106.44; 106.45; 106.46.  What constitutes a reasonable response to discrimination will depend on the circumstances.  But in all cases, the recipient must conduct a prompt, adequate, and impartial inquiry designed to reliably determine what occurred, and, if discrimination is found, the recipient must take reasonable, timely, age-appropriate, and effective corrective action, including steps tailored to the specific situation. *See id.*

    **f.  The Office for Civil Rights Has Authority to Enforce Title IX and Its Implementing Regulations Against Noncompliant Recipients of Federal Funding**

If OCR "finds that a recipient has discriminated against persons on the basis of sex in an education program or activity under this part, or otherwise violated this part," then the noncompliant "recipient must take such remedial action" as OCR "deems necessary to remedy the violation, consistent with 20 U.S.C. § 1682." 34 C.F.R. § 106.3.

As a condition of receiving federal financial assistance from the Department of Education, a recipient must make an assurance that the education program or activity will be operated in compliance with Title IX. 34 C.F.R. § 106.4(a). The obligation to comply with Title IX is "not obviated or alleviated by any State or local law" or "by any rule or regulation of any organization, club, athletic or other league, or association," except to the extent required by the U.S. Constitution. 34 C.F.R. § 106.6(b)-(d).

34 C.F.R. § 106.81 incorporates "[t]he procedural provisions applicable to Title VI of the Civil Rights Act of 1964," which are codified at "34 CFR 100.6 through 100.11 and 34 CFR part 101." 34 C.F.R. § 100.7 authorizes OCR to investigate possible deprivations of the rights protected by the statutes within its jurisdiction. And 34 C.F.R. § 100.8(c)-(d) authorizes, *inter alia*, "the suspension or termination of or refusal to grant or to continue federal financial assistance" or referral "to the Department of Justice with a recommendation that appropriate

---

Interpretation"). The Policy Interpretation provides a "three-part test" to assess compliance. *See Berndsen v. N. Dakota Univ. Sys.*, 7 F.4th 782, 786 (8th Cir. 2021). The "three-part test" can be, and has been, used by OCR and courts to apply § 106.41(c). *It is not applicable here*. The three-part test is a helpful tool to determine when efforts to provide women with an equal athletic opportunity have been effective. It has nothing to say when, as here, women have been *denied* access to sex-segregated athletics opportunities.

*Page 26 Letter of Findings – OCR case no. 08255902*

proceedings be brought to enforce any rights of the United States under any law of the United States."

Moreover, all federal grant recipients from the Department are required to comply with all applicable federal laws, including Title IX, and all related Executive Orders. 34 C.F.R. § 75.500.

### g. Recipients of Federal Funding Must Provide OCR Access to Sources of Information Pertinent to Ascertain Compliance with Title IX

The regulations further provide:

> *Access to sources of information.* Each recipient shall permit access by the responsible Department official or his designee during normal business hours to such of its books, records, accounts, and other sources of information, and its facilities as may be pertinent to ascertain compliance with this part. Where any information required of a recipient is in the exclusive possession of any other agency, institution or person and this agency, institution or person shall fail or refuse to furnish this information the recipient shall so certify in its report and shall set forth what efforts it has made to obtain the information. Asserted considerations of privacy or confidentiality may not operate to bar the Department from evaluating or seeking to enforce compliance with this part. Information of a confidential nature obtained in connection with compliance evaluation or enforcement shall not be disclosed except where necessary in formal enforcement proceedings or where otherwise required by law.

34 C.F.R. § 100.6(c). In accordance the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, and FERPA's implementing regulation at 34 C.F.R. § 99.31(a)(3)(iii), OCR is authorized to review personally identifiable information in a recipient's records without redaction of private or confidential student information.

### III. Analysis

### A. The District has violated and is still violating Title IX and its implementing regulations by permitting male students to access female bathrooms, locker rooms, and overnight accommodations.

The District's policies violate Title IX because they segregate intimate facilities and assign overnight accommodations on the basis of a student's "gender identity consistently asserted at school."

When a recipient of federal funding separates locker rooms, student housing, and overnight stays arrangements based on sex, the recipient is not "discriminat[ing]" based on sex because the recipient is treating the sexes differently with a sufficient justification: the real biological and privacy-based differences between men and women. But when the recipient separates such intimate facilities based on sex and also allows males with a certain "gender identity" to use the women's facilities, that undermines the recipient's justification for different treatment based on

*Page 27 Letter of Findings – OCR case no. 08255902*

sex. Because these recipients are segregating based on sex without any biological justification for doing so, they are illegally discriminating based on sex, without a valid basis under Title IX.

Here, the District has purported to create sex-separate intimate facilities but it has abandoned the biological justification for sex separation in intimate facilities by allowing males who identify as females to use intimate facilities designated for females. So it discriminates based on sex by separating the sexes without a valid basis under Title IX and thus is in violation of Title IX. 20 U.S.C. § 1681(a).

Further, as explained above, 34 C.F.R. § 106.33 authorizes recipients to segregate intimate facilities on the basis of biological sex, not "gender identity." The regulations could not be more clear on that point: "A recipient may provide separate [intimate facilities] on the basis of *sex*, but such facilities provided for students of *one sex* shall be comparable to such facilities provided for students of *the other sex*." *Id.* (emphasis added). A recipient that designates separate intimate facilities for male and female students and then permits male students to access the female facilities thus violates Title IX.

In so doing, the recipient also facilitates the repeated violation of the privacy and dignity of its female students. *See Adams*, 57 F.4th at 804-05; *Grimm*, 972 F.3d at 634-36 (4th Cir. 2020) (Niemeyer, J., dissenting). Indeed, such a recipient imposes on female students the very harms that § 106.33 was intended to prevent. Section 106.33 exists to protect a particularly acute "need for privacy" in places like school bathrooms and locker rooms. *See Grimm*, 972 F.3d at 634 . "To state the obvious, what bathroom, locker room, shower, and living facilities all have in common is that they are places where people are, at some point, in a state of partial or complete undress. . . . An individual has a legitimate and important interest in bodily privacy that is implicated when his or her nude or partially nude body is exposed to others. And this privacy interest is significantly heightened when persons of the opposite biological sex are present." *Id.* at 633-34 (collecting cases). That "privacy interest is heightened yet further when children use communal restrooms and similar spaces, because children . . . 'are still developing, both emotionally and physically.'" *Id.* at 636; *accord Adams*, 57 F.4th at 804-05.

The same logic extends to overnight accommodations and in other intimate spaces. In line with this tradition, Title IX itself clarifies that its general sex-discrimination bar does not "prohibit any educational institution … from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. Further recognizing that sex separation is necessary to adhere to Title IX's requirements, one of Title IX's implementation regulations - which has existed since Title IX's enactment - expressly permits a recipient to provide separate toilet, locker room, and shower facilities based on sex. 34 C.F.R. § 106.33. The separate-living-facilities clarification (20 U.S.C. § 1686) and the separate-sensitive-facilities regulation (34 C.F.R. § 106.33) are grounded in students' privacy, safety, and dignitary interest in using the bathroom away from students of the opposite sex and in shielding their bodies from students of the opposite sex while changing in the locker room and in other intimate spaces.

This harm is not hypothetical. The District's policies affect real students. The families of the two students on District sponsored trips were compelled to seek relief in federal court for their students—who the District forced, at eleven-years-old, to choose between allowing violations of bodily privacy or participating fully in meaningful educational opportunities.

*Page 28 Letter of Findings – OCR case no. 08255902*

Recipients have an obligation under Title IX to all students in the provision of restrooms, locker rooms, and overnight accommodations. Students at school have enough to worry about; worrying about whether it is safe to use the bathroom, change in a locker room, or sleep during overnight trips, cannot be one of them. *See, e.g.*, Women's Sports Pol'y Working Grp., Access to Female Athletes' Locker Rooms Should Be Restricted to Female Athletes, https://womenssportspolicy .org/access-to-female-athletes-locker-rooms-should-be-restricted-to-female-athletes-january-28-2023/ ("Women's locker rooms are designed to provide female athletes with a separate, safe, private place to shower, change clothes, and use the toilet.").

When recipients, such as the District, allow males to use intimate facilities designated for females based only upon subjective perceptions of their own "gender," they are facilitating the significant deleterious effects—including discomfort, embarrassment, psychological harm, and potential physical injury—that Title IX seeks to prevent, and heighten the risk and likelihood of sexual harassment which results in a denial of the overall benefits of an education program or activity based on sex, in violation of Title IX, including 20 U.S.C. § 1681(a), and 34 C.F.R. §§ 106.31, 106.33.

**B. The District has violated and is still violating Title IX and its implementing regulations by denying equal athletic benefits and opportunities to female student athletes by permitting males to participate in girls' interscholastic athletics.**

The District's policies related to athletics violate Title IX by discriminating against female students in violation of 34 C.F.R. § 106.41(a) (and outside the exception created by 34 C.F.R. § 106.41(b)) and by denying female students the equal opportunity in athletics guaranteed by 34 C.F.R. § 106.41(c).

When a recipient of federal financial assistance separates sports based on sex, the recipient is not "discriminat[ing]" based on sex because the recipient is treating the sexes differently with a sufficient justification: the real biological differences between men and women. But when the recipient separates sports based on sex and also allows males with a certain "gender identity" to participate in women's sports, that undermines the recipient's justification for different treatment based on sex. Because these recipients are segregating based on sex without any biological justification for doing so, they are illegally discriminating based on sex, without a valid basis under Title IX.

Here, the District has abandoned the biological justification for sex separation in athletics by allowing males who identify as females to participate in girls' athletics, so the District is discriminating based on sex by separating the sexes without a valid basis under Title IX and thus is in violation of Title IX. 20 U.S.C. § 1681(a).

Title IX's athletics regulation—which is a contemporaneous and accurate interpretation of Title IX that has been endorsed by Congress, *see Loper Bright*, 603 U.S. at 394; *Grove City*, 465 U.S. at 568—also shows that the District's actions violate Title IX. That regulation first sets out a "[g]eneral" rule prohibiting sex-separated teams: "No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics

*Page 29 Letter of Findings – OCR case no. 08255902*

separately on such basis." 34 C.F.R. § 106.41(a). It then lays out the only circumstance where recipients may have "[s]eparate teams": "Notwithstanding the requirements of paragraph (a) of this section, a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." *Id.* § 106.41(b). Still, "where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport." *Id.*

The District is in clear violation of the athletics regulations. As explained, the regulations categorically prohibit discrimination based on sex. 34 C.F.R. § 106.41(a). The regulations exempt from that prohibition athletics teams "where selection for such teams is based upon competitive skill . . .", but only to the extent that that such segregation is truly on the basis of sex. 34 C.F.R. § 106.41(b). But the District is not segregating exclusively based on sex: Though the District purports to have male and female athletics programs, the programs are not "for members of each sex," as the District allows males with a certain "gender identity" to participate on the girls teams. The regulations, on their face, do not permit segregation on the basis of gender identity. And, as explained at length above, segregation on the basis of gender identity does *not* help create fair competition for the members of each sex. To the contrary: allowing male students to participate on a girls' team *undermines* fair competition for female students.

The facts of this case demonstrate the harm. Using the roster data provided by the District, students who identify as male occupy 21 roster positions in the District's Girls' Cross Country program, 11 positions in the Girls' Soccer program, and 15 roster positions in the Girls' Tennis program. In total, including one student who identifies as nonbinary, at least 61 female roster positions are held by students who do not identify as female. The District's policies implicitly recognize the physical differences in size and strength between boys and girls by creating sex separated interscholastic athletic programs and by using different equipment for boys and girls to accommodate these differences; however, its policies undermine girls athletics by nonetheless allowing males to participate, exploiting their innate biological advantages, typically including greater size and strength. In so doing, the District violates 34 C.F.R. § 106.41(a).

The athletics regulation also provides that "[a] recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c). Accordingly, the District must meet the interests and abilities of male and female students and provide equivalent treatment, benefits, and opportunities for male and female athletes. The District *cannot* meet this requirement. The District indicated that it does not track information "regarding the sex of 'any participants who are biologically male;'" rather, the District tracks rosters for District athletic teams by "the gender provided by students and/or their families." But the regulations require an assessment of "equality of opportunity for members of each sex," meaning biological sex. § 106.41(c). That is impossible without data recording participation in athletics by biological sex. In other words, by refusing to collect the data it needs to enforce § 106.41(c), the District has abdicated its responsibilities under that provision. Due to its own decisions, the District cannot provide equal athletic opportunity for female students, and, thus, consciously violates both that provision, § 106.41(c), and 34 C.F.R. § 100.6(b) (incorporated by 34 C.F.R. § 106.81).

*Page 30 Letter of Findings – OCR case no. 08255902*

### C. Effect of Conflicting State Law and CHSAA Policy

The District acknowledges that it permits male students to compete in interscholastic athletic programs designated for female students but indicates it does so, in part, because of CHSAA policy and existing Colorado state law. Similarly, the District claims that Colorado state law requires access to restrooms, locker rooms, and overnight accommodations based on gender identity. The District's reliance on CHSAA policy and/or Colorado state law fails to account for the District's obligations to follow Title IX and all related regulations and Executive Orders as a recipient of federal funding, notwithstanding any conflicting state laws or rules of private organizations.

The Title IX implementing regulation at 34 C.F.R. § 106.6(b)-(c) clearly states in relevant part:

> (b) Effect of State or local law or other requirements. The obligation to comply with this part is not obviated or alleviated by any State or local law or other requirement which would render any applicant or student ineligible, or limit the eligibility of any applicant or student, on the basis of sex, to practice any occupation or profession.

> (c) Effect of rules or regulations of private organizations. The obligation to comply with this part is not obviated or alleviated by any rule or regulation of any organization, club, athletic or other league, or association which would render any applicant or student ineligible to participate or limit the eligibility or participation of any applicant or student, on the basis of sex, in any education program or activity operated by a recipient and which receives federal financial assistance.

34 C.F.R. § 106.6(b)-(c).

Additionally, all federal grant recipients from the Department are required to comply with all applicable federal laws, including Title IX, and all related Executive Orders. 34 C.F.R. § 75.500.

Finally, it appears that the District's representations to us might have been inaccurate. The aforementioned agreement announced December 5, 2025, between CHSAA and School District 49 demonstrates that CHSAA members can, in fact, maintain biological sex-based policies for sports, locker rooms, and overnight accommodations while continuing to participate fully in CHSAA-sanctioned activities.

### IV. Conclusion

This concludes OCR's investigation. This letter of noncompliance should not be interpreted to address the District's compliance with any other regulatory provision or to address any issues other than those addressed in this letter. This letter sets forth OCR's determination in an individual OCR case. This letter is not a formal statement of OCR policy and should not be relied on, cited, or construed as such. OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public. Individuals who file complaints with OCR may have the right to file a private suit in federal court whether or not OCR finds a violation.

*Page 31 Letter of Findings – OCR case no. 08255902*

Please be advised that the District must not harass, coerce, intimidate, discriminate, or otherwise retaliate against an individual because that individual asserts a right or privilege under a law or regulation enforced by OCR or files a complaint, testifies, assists, or participates in a proceeding under a law or regulation enforced by OCR. If this happens, the individual may file a retaliation complaint with OCR.

This letter is accompanied by a proposed resolution agreement that specifies actions that will remedy current and past discrimination, and to prevent any similar instances where future violative conduct may recur. If OCR determines an agreement will not be reached, the Department may begin enforcement action including referral to the U.S. Department of Justice or other means authorized by law, including the initiation of an action to suspend, terminate, or refusal to grant or continue federal financial assistance.

Sincerely yours,

*Erica R. Austin*

Erica R. Austin
Acting Regional Director
Office for Civil Rights, Denver

Enclosure
cc:    Julie.Tolleson@jeffco.k12.co.us
       Jacquie.RichFredericks@jeffco.k12.co.us